**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>ECOLOGICAL RIGHTS FOUNDATION,<br><i>Plaintiff-Appellant</i>,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC<br>COMPANY; PACIFIC BELL<br>TELEPHONE COMPANY,<br><i>Defendants-Appellees</i>.</td><td>No. 11-16042<br><br>D.C. No.<br>4:09-cv-03704-<br>SBA<br><br><br>OPINION</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
October 16, 2012—San Francisco, California

Filed April 3, 2013

Before: Richard C. Tallman, Consuelo M. Callahan,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge Hurwitz

**SUMMARY**[*]

**Environmental Law**

The panel affirmed the dismissal of a citizen suit alleging that utility poles discharged wood preservative into the environment in violation of the Clean Water Act and the Resource Conservation and Recovery Act.

The panel held that the plaintiff failed to state a claim under the CWA because discharges of stormwater from the utility poles were neither a "point source discharge" nor "associated with industrial activity." The plaintiff failed to state a claim under RCRA because wood preservative that escaped from the utility poles was not a "solid waste."

Concurring in part and concurring in the result, Judge Hurwitz wrote that he concurred in the majority opinion except insofar as it held that utility poles cannot be point sources for purposes of the CWA under circumstances not presented by this case. He wrote that resolution of this issue was unnecessary given the conclusion, which he joined, that the defendants' utility poles were not associated with industrial activity.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Christopher Sproul (argued), Jodene Isaacs, and Brian Orion, Environmental Advocates, San Francisco, California; William Verick, Klamath Environmental Law Center, Eureka, California, for Plaintiffs-Appellants.

Russell B. Selman, Bradley S. Rochlen (argued), and J. Michael Showalter, Schiff Hardin LLP, Chicago, Illinois, for Defendant-Appellee Pacific Gas & Electric Company.

Douglas W. Sullivan (argued) and Joel D. Smith, Crowell & Morring LLP, San Francisco, California, for Defendant-Appellee Pacific Bell Telephone Company.

Daniel J. Herling, Keller & Heckman LLP, San Francisco, California, for amicus KMG-Bernuth, Inc.

Karma B. Brown, Hunton & Williams LLP, Washington, D.C.; Brooks M. Smith, Hunton & Williams LLP, Richmond, Virginia, for amici American Coke & Coal Chemicals Institute, et al.

---

**OPINION**

CALLAHAN, Circuit Judge:

Defendants-Appellees Pacific Gas & Electric Company ("PG&E") and Pacific Bell Telephone Company ("Pacific Bell") own and maintain utility poles throughout the San Francisco Bay Area. Many of the poles are treated with a wood preservative that contains pentachlorophenol ("PCP"), a general biocide, and other chemicals. Plaintiff-Appellant

Ecological Rights Foundation ("ERF") filed this action against both companies, alleging that the poles discharge wood preservative into the environment in violation of the federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k.

The district court, which had jurisdiction pursuant to 28 U.S.C. § 1331, 33 U.S.C. § 1365(a)(1), and 42 U.S.C. § 6972(a)(1)(B), dismissed ERF's action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), without leave to amend.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.  ERF fails to state a claim under the CWA because discharges of stormwater from the utility poles are neither a "point source discharge" nor "associated with industrial activity."  ERF also fails to state a claim under RCRA because wood preservative that escapes from the utility poles is not a "solid waste."  Finally, the district court did not abuse its discretion in denying ERF leave to amend; ERF had, and took advantage of, two opportunities to amend its complaint, and none of ERF's proposed amendments would cure the defects in its allegations.

## BACKGROUND

### A.  Statutory and regulatory background

### 1.  The CWA

The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA prohibits the "discharge of any pollutant."  *Id.* § 1311(a).  "Discharge of a

pollutant" refers to "any addition of any pollutant to navigable waters from any point source;" "pollutant" refers to, among other things, "solid waste" and "chemical wastes;" and "navigable waters" refers to "the waters of the United States . . . ." *Id.* §§ 1362(6), (7), (12).

The Environmental Protection Agency ("EPA"), or a State to which EPA has delegated its authority, may issue a National Pollutant Discharge Elimination System ("NPDES") permit "for the discharge of any pollutant, . . . notwithstanding section 1311(a) of this title." *Id.* § 1342(a). NPDES permits are required for discharges from any "point source," but not for discharges from "nonpoint sources." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002). Permits are either individual (authorizing "a specific entity to discharge a pollutant in a specific place" through an informal adjudication) or general (authorizing entities in a geographic area to discharge following a rulemaking). *NRDC v. U.S. EPA*, 279 F.3d 1180, 1183 (9th Cir. 2002).

Stormwater presents a unique problem under the CWA because it is a significant source of water pollution but is not "inherently a nonpoint or point source." *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1070–71 (9th Cir. 2011), *rev'd on other grounds*, *Decker v. Nw. Envtl. Def. Ctr.*, — U.S. — , 2013 WL 1131708 (Mar. 20, 2013); *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 840–41 (9th Cir. 2003). EPA originally attempted to exempt stormwater discharges from NPDES permitting, but the D.C. Circuit found such exemption unlawful. *NRDC v. Costle*, 568 F.2d 1369, 1379 (D.C. Cir. 1977). EPA then passed regulations and, in 1987, Congress amended the CWA to regulate stormwater. Pub. L.

No. 100-4, 101 Stat. 7 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Decker*, 2013 WL 1131708, at *4.

The 1987 amendments established a two-phase approach. *See generally Envtl. Def. Ctr.*, 344 F.3d at 841–43. In Phase I, EPA required NPDES permits for the most significant stormwater discharges: those from a prior permitted source or large municipality; those that "contribute[ ] to a violation of a water quality standard or [are] a significant contributor of pollutants to waters of the United States;" and, most significantly for this case, those "associated with industrial activity." 33 U.S.C. § 1342(p)(2); *see also* [NPDES] Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122–124). In Phase II, EPA required NPDES permits for stormwater discharges from smaller municipal storm systems and construction sites that disturb between one and five acres. 40 C.F.R. § 122.26(a)(9)(i)(A)–(B); *see also* [NPDES]—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722 (Dec. 8, 1999) (codified at 40 C.F.R. pts. 9, 122, 123, and 124). EPA retained authority to regulate other stormwater discharges on a local or regional, as-needed basis. 40 C.F.R. § 122.26(a)(9)(i)(C)–(D). We upheld most of EPA's Phase II regulation, including EPA's decision to retain authority to designate other stormwater discharges on a case-by-case basis, in *Environmental Defense Center*, 344 F.3d at 856–60, 873–78.

## 2. RCRA

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479,

483 (1996). RCRA's "primary purpose" is "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)).

### 3. Citizen suits

Chief responsibility for enforcement of the CWA and RCRA lies with EPA, which may delegate that authority to the States. Both statutes provide for "citizen suits" against persons who are alleged to be in violation of the statutes' requirements. *See* 33 U.S.C. § 1365; 42 U.S.C. § 6972.

A private citizen may file an action under the CWA against a person "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). A citizen may file an action under RCRA "against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

A citizen plaintiff must give notice to the alleged violator at least 60 days before filing suit under the CWA, and, for the action at issue here, at least 90 days under RCRA. 33 U.S.C. § 1365(b)(1)(A); 42 U.S.C. § 6972(b)(2)(A); *see also Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989) (holding that RCRA's notice and delay requirements, if not jurisdictional, "are mandatory conditions precedent to

commencing suit under the RCRA citizen suit provision"); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 636 (9th Cir. 2004) (holding that RCRA requirements are jurisdictional); *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009) ("[T]he giving of a 60-day notice [under the CWA] is . . . a jurisdictional necessity.").[1]

## B.  Factual and procedural background

On June 4, 2009, ERF sent a letter to PG&E stating that it intended to file a citizen suit under the CWA and RCRA. The letter alleged that PG&E had violated these statutes by releasing into the environment wood preservative from PG&E's utility poles in Alameda, Contra Costa, Marin, and San Francisco Counties.  The letter contended that wood preservative is oil-based and contains "toxic" chemicals, including PCP and various forms of dioxin.  The letter included a non-exhaustive list of utility poles in dispute and the dates of the alleged violations.

On August 13, 2009, ERF filed a complaint against PG&E asserting CWA claims.  Thirty days later, ERF filed a first amended complaint adding a RCRA claim and attaching the June 2009 notice letter.  ERF sent two more notice letters dated October 14, 2009, and January 6, 2010.  The October 2009 notice added alleged responsible parties but was otherwise identical to the June 2009 notice.  The January 2010 notice added Pacific Bell, among other parties, and

---

[1] No citizen suit may proceed if EPA or a State chooses to bring its own action against the alleged violator.  33 U.S.C. § 1365(b)(1)(B); 42 U.S.C. § 6972(b)(2)(B)–(C).  Neither EPA nor the State of California has so intervened in this action.

discussed poles treated with any chemical preservative, not just PCP.

On June 21, 2010, ERF filed a second amended complaint, the operative complaint in this appeal. The complaint added Pacific Bell as a defendant and alleged that PG&E and Pacific Bell had violated and were violating: (1) the CWA, 33 U.S.C. § 1311(a), by discharging "pollutant-bearing storm water runoff" from their utility poles into waters of the United States without an NPDES permit; (2) the CWA, *id.* §§ 1311(a), 1342, by failing to obtain an NPDES permit, regardless of any discharges; and (3) RCRA, 42 U.S.C. § 6972(a)(1)(B), by contributing to "the past and present handling, storage, treatment, transportation and disposal of solid waste," which may present an "imminent and substantial endangerment to health or the environment."

PG&E and Pacific Bell filed motions to dismiss the second amended complaint for failure to state a claim. The district court granted the defendants' motions. *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 803 F. Supp. 2d 1056 (N.D. Cal. 2011). The court dismissed the CWA claim on the ground that stormwater runoff contaminated by wood preservative from the defendants' utility poles is not a "point source" discharge requiring an NPDES permit. *Id.* at 1062–63. The court dismissed the RCRA claim on the ground that wood preservative that escapes from the defendants' utility poles is not a "solid waste" under RCRA. *Id.* at 1063–65. The court dismissed the second amended complaint without leave to amend because ERF's "theory of

liability under the CWA and RCRA cannot be rectified by further amendment to the pleadings." *Id.* at 1065.[2]

ERF appeals only the dismissal of its first CWA claim (discharge without an NPDES permit) and RCRA claim; ERF does not appeal the dismissal of its second CWA claim (failure to obtain an NPDES permit regardless of any discharge).

## STANDARD OF REVIEW

"We review de novo the district court's dismissal of a complaint for failure to state a claim. We review for abuse of discretion a district court's decision to dismiss with prejudice." *Okwu v. McKim*, 682 F.3d 841, 844 (9th Cir. 2012) (internal and external citations omitted). The court may affirm the dismissal on any ground supported by the record. *United States v. Washington*, 573 F.3d 701, 706 (9th Cir. 2009). The court must accept "all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009) (quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

---

[2] PG&E also moved to dismiss ERF's complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The district court denied this motion. *Ecological Rights Found.*, 803 F. Supp. 2d at 1060–61.

## DISCUSSION

### A. Dismissal under Rule 12(b)(6)

#### 1. CWA

##### a. "Point source" discharges

The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. . . ."  33 U.S.C. § 1362(14).  The CWA does not define "nonpoint source," but we have explained that

> it is widely understood to be the type of pollution that arises from many dispersed activities over large areas, and is not traceable to any single discrete source.  Because it arises in such a diffuse way, it is very difficult to regulate through individual permits.  The most common example of nonpoint source pollution is the residue left on roadways by automobiles.  Small amounts of rubber are worn off of the tires of millions of cars and deposited as a thin film on highways; minute particles of copper dust from brake linings are spread across roads and parking lots each time a driver applies the brakes; drips and drabs of oil and gas ubiquitously stain driveways and streets.  When it rains, the rubber particles and copper dust and gas and oil wash off of the

> streets and are carried along by runoff in a
> polluted soup, winding up in creeks, rivers,
> bays, and the ocean.

*League of Wilderness Defenders*, 309 F.3d at 1184; *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 785 (9th Cir. 2008) (discussing regulation, or lack thereof, of "nonpoint sources").

Stormwater runoff is "a nonpoint or point source . . . depending on whether it is allowed to run off naturally (and is thus a nonpoint source) or is collected, channeled, and discharged through a system of ditches, culverts, channels, and similar conveyances (and is thus a point source discharge)." *Brown*, 640 F.3d at 1071; *see also Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1152 (9th Cir. 2010), *as amended* (Jan. 25, 2011) ("The text of [the CWA] and the case law are clear that some type of collection or channeling is required to classify an activity as a point source."); *Envtl. Def. Ctr.*, 344 F.3d at 841 n.8 ("Diffuse runoff, such as rainwater that is not channeled through a point source, is considered nonpoint source pollution and is not subject to federal regulation."); *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984) ("[P]oint and nonpoint sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by whether the pollution reaches the water through a confined, discrete conveyance."); *cf. Decker*, 2013 WL 1131708, at *16 (Scalia, J., concurring in part and dissenting in part) (explaining that stormwater runoff from logging roads "came from point sources, because they flowed out of artificial 'pipe[s],' 'ditch[es],' and 'channel[s],' 33 U.S.C. § 1362(14), and were thus not '*natural* runoff'").

ERF alleges that rain falls on and around the defendants' utility poles and becomes contaminated with wood preservative. As a result, the preservative is "carried by storm water runoff discharged from the Poles to San Francisco Bay, its tributaries and adjacent wetlands." Such allegations of generalized stormwater runoff do not establish a "point source" discharge absent an allegation that the stormwater is discretely collected and conveyed to waters of the United States. *See Greater Yellowstone Coal.*, 628 F.3d at 1152–53 (holding that stormwater that seeps through a mining pit cover is "nonpoint source pollution because there is no confinement or containment of the water"); *Trustees for Alaska*, 749 F.2d at 558 ("[N]onpoint source pollution [i]s runoff caused primarily by rainfall around activities that employ or create pollutants.").

ERF's two counterarguments give it no purchase. First, ERF contends that the district court (and by extension, we) have read into its complaint an allegation it does not contain—that the stormwater runoff reaches regulated waters "through natural means." However, given the longstanding distinction in our case law between natural and conveyed stormwater under the CWA, the district court's reading is reasonable absent any allegation that the runoff reaches regulated waters via some other method. *See Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (explaining that point source "conveyances" are "the means by which pollutants are ultimately deposited into a navigable body of water").

To get around the absence of a conveyed stormwater allegation in its complaint, ERF next contends that the defendants' utility poles are themselves "conveyances." In other words, ERF contends that "point sources" are not just

"ditches, culverts, and similar channels," but any "tangible, identifiable thing." Because the CWA is ambiguous on this issue, we would normally defer to EPA. *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). But EPA has not yet determined whether utility poles are point sources; until EPA addresses that question, we look to cases for guidance. *See Garfias-Rodriguez v. Holder*, 702 F.3d 504, 512–13 (9th Cir. 2012) (en banc) (granting *Chevron* deference to agency interpretation issued after contrary circuit cases); *Managed Pharmacy Care v. Sebelius*, 705 F.3d 934, 943–44 (9th Cir. 2012) (holding that the Ninth Circuit was not bound by a prior opinion rendered without the benefit of the agency's statutory interpretation or participation in the litigation).

The case law does not support ERF's attempt to characterize the poles as point sources. The cases ERF cites involved things that (1) the CWA specifically identifies as point sources,[3] (2) were constructed for the express purpose of storing pollutants or moving them from one place to another,[4] or (3) no one disputed were point sources.[5] Solid

---

[3] *See, e.g.*, *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 308 n.9 (3d Cir. 1997) (barges and their components, which are "vessel[s] or floating craft[s]" under 33 U.S.C. § 1362(14)); *United States v. M.C.C. of Fla., Inc.*, 772 F.2d 1501, 1505-06 (11th Cir. 1985), *judgment vacated on other grounds*, 481 U.S. 1034, 107 S. Ct. 1968, 95 L. Ed. 2d 809 (1987) ("[T]he tugs used by M.C.C. were point sources since the [CWA] specifically includes vessels within the meaning of that term"); *see also Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (concentrated animal feeding operations); 33 U.S.C. § 1362(14) (listing additional things that are "point sources").

[4] *See, e.g.*, *Peconic Baykeeper, Inc. v. Suffolk Cnty.*, 600 F.3d 180, 188–89 (2d Cir. 2010) (aerial pesticide sprayers); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1009 (11th Cir. 2004) (piled debris that collected stormwater and channeled it into a nearby stream); *Concerned*

wood utility poles are none of these things.  Recognizing the lack of clarity in the CWA, we conclude that, in the absence of any guidance from EPA, utility poles simply are not "discernible, confined and discrete conveyance[s]" that "channel[ ] and control[ ]" stormwater.   33 U.S.C. § 1362(14); *Brown*, 640 F.3d at 1079; *see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004) (emphasizing that "point source" refers to things that *transport* pollutants); *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 646 (2d Cir. 1993) (explaining that "point sources" are "physical structures and instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways").   For these

---

*Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 118-19 (2d Cir. 1994) (manure spreader, which was a "rolling stock" or "container" under 33 U.S.C. § 1362(14)); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983) (bulldozers and backhoes, "since they collected into windrows and piles material that may ultimately have found its way back into the waters"); *Sierra Club*, 620 F.2d at 45 (human-made spoil piles and sediment basins that collected and channeled stormwater); *United States v. Earth Scis., Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) ("combination of sumps, ditches, hoses and pumps is a circulating or drainage system to serve" a mining operation); *see also League of Wilderness Defenders*, 309 F.3d at 1185 ("aircraft equipped with tanks spraying pesticide from mechanical sprayers directly over covered waters"); *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 815 (9th Cir. 2001), *aff'd*, 537 U.S. 99 (2002) (bulldozers and backhoes, which ripped up and redistributed the bottom layer of soil (the "pollutant")); *Trustees for Alaska*, 749 F.2d at 558 (sluice box, a "confined channel" that released discharge water from a mine).

[5] *See, e.g.*, *Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.*, 280 F.3d 1364, 1367 (11th Cir. 2002), *rev'd on other grounds*, 541 U.S. 95 (2004) ("No party disputes that . . . pump station and, in particular, the pipes from which water is released constitute a point source . . . .").

reasons, ERF has failed to state a claim upon which relief may be granted under the CWA.

### b.   Additional allegations

ERF argues that its second amended complaint is not limited to the allegation that contaminated stormwater runoff flows from the utility poles directly into waters of the United States.  According to ERF, its complaint also alleges that: (1) the defendants' utility poles discharge directly into waters of the United States (through preservative dripping into marshes in which the poles are located), and (2) the stormwater runoff from the poles is collected in unidentified ditches, channels, and other conveyances which then discharge into waters of the United States.

ERF never made this argument in the extensive motion proceedings in the district court, and therefore waived it.  *See Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012) ("[A]n issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it." (quotation marks omitted)).  As ERF conceded at oral argument, ERF opposed the defendants' motions to dismiss on the theory that utility poles are themselves point sources of generalized stormwater runoff, not on the theory that the poles discharged directly into waters of the United States or that the runoff was collected and conveyed into such waters.

ERF's failure to urge these theories below is facially consistent with the second amended complaint.  The complaint's only allegation regarding how the utility poles contaminate waters of the United States is through the generalized "discharge" of stormwater, with no mention of

the direct discharge of wood preservative or the collection and conveyance of contaminated stormwater via channels. Although ERF points to words and phrases such as "leak[ing]," "drip[ping]," and "contaminat[ion of] surface waters" in its complaint, these isolated fragments cannot bear the weight ERF places upon them. *See Iqbal*, 556 U.S. at 686 ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (explaining that a complaint must "possess enough heft" to show a plausible claim for relief); *A.E. ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) ("[A]llegations in a complaint or counterclaim . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." (quotation marks omitted)).

Perhaps recognizing the absence of a direct discharge or collected runoff theory in its complaint, ERF urges us to read the complaint together with its CWA notice letters. Under the "incorporation by reference" doctrine, "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). Whether a document is "central" to a complaint turns on whether the complaint "necessarily relies" on that document. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). ERF's notice letters, however, contain no direct discharge allegations.   Because a notice letter is a jurisdictional prerequisite to suit, ERF cannot pursue allegations its notice letter does not contain. *See supra* at

7–8; *Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995). ERF's notice letters do contain allegations about collected and conveyed runoff, but ERF did not refer "extensively" to those notices and they were not integral to ERF's complaint. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document.").

In short, ERF's second amended complaint does not allege that stormwater runoff from the poles is collected in channels and then conveyed to waters of the United States, or that the utility poles discharge directly into waters of the United States. ERF "may not try to amend [its] complaint through [its] arguments on appeal." *Riggs v. Prober & Raphael*, 681 F.3d 1097, 1104 (9th Cir. 2012) (citing *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 822 (5th Cir.1996) ("[T]he Court will not allow a party to raise an issue for the first time on appeal merely because a party believes that he might prevail if given the opportunity to try a case again on a different theory." (citation omitted))).

### c.   "Discharge associated with industrial activity"

Dismissal of ERF's CWA claim was proper for another, independent reason. As discussed above, EPA requires NPDES permits for only certain categories of stormwater discharges. The only category ERF argues applies in this case is "discharge[s] associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B). We conclude that stormwater runoff from the defendants' utility poles is not "associated with industrial activity," for at least four reasons.

First, stormwater runoff from the defendants' utility poles does not fit within EPA's definition of "discharge associated with industrial activity," which is "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage at an industrial plant. . . ." 40 C.F.R. § 122.26(b)(14). A utility pole is not a "conveyance . . . used for collecting and conveying storm water," nor is it "directly related to manufacturing, processing or raw materials storage at an industrial plant." Nor is a utility pole a plant yard, access road, prior industrial area, material handling, storage, or treatment site, or any of the other types of industrial facilities specifically identified in 40 C.F.R. § 122.26(b)(14)(i)–(xi).

The Supreme Court's recent decision in *Decker*, *supra*, supports our analysis. There, the Court held that discharges of channeled stormwater runoff from logging roads were not "associated with industrial activity." *Decker*, 2013 WL 1131708, at *10–12. The Court explained that, among other things, EPA "reasonably could conclude" that § 122.26(b)(14) "extends only to traditional industrial buildings such as factories and associated sites, as well as other relatively fixed facilities," not to temporary logging roads that lack a "closer connection to traditional industrial sites." *Id.* at *10. Utility poles may or may not be more permanent than logging roads, but, like stormwater runoff from such roads, runoff from utility poles is not "'directly related to manufacturing, processing or raw materials storage at an industrial plant.'" *Id.* (quoting § 122.26(b)(14)).[6]

---

[6] It is true that in *Decker* the Court applied deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997), to EPA's "silvicultural rule," whereas here there is no administrative interpretation to defer to. Our reading of

The second reason why stormwater runoff from the defendants' utility poles is not "associated with industrial activity" has to do with Standard Industrial Classification ("SIC") codes, the classification system § 122.26(b)(14) uses to define the industrial activities it covers. *See* 40 C.F.R. § 122.26(b)(14)(ii)–(iii), (vi), (viii), (xi); *see also Decker*, 2013 WL 1131708, at *5, 9–10. No SIC code cited in § 122.26(b)(14) covers utility poles.[7] ERF argues that the regulation's listing of SIC codes and corresponding facilities is illustrative, not exclusive, but the regulation and our case law suggest otherwise. *See* 40 C.F.R. § 122.26(b)(14) ("The following categories of facilities are considered to be engaging in 'industrial activity' . . . ."); *Envtl. Def. Ctr.*, 344 F.3d at 858 n.37 ("EPA used . . . [SIC] codes in defining the universe of regulated industrial activities.").

Third, EPA included "steam electric power generating facilities" in the definition of "industrial activity," but rejected including "major electrical powerline corridors" in the regulation. *See* 40 C.F.R. § 122.26(b)(14)(vii); [NPDES] Application Regulations for Storm Water Discharges, 53 Fed. Reg. 49,416, 49,432 (proposed Dec. 7, 1988) ("EPA prefers

---

§ 122.26(b)(14) as applied to ERF's allegations is the most natural one in the absence of guidance from EPA.

[7] The SIC Codes for communication and electrical services are 4813 and 4911, respectively. *See* U.S. Dep't of Labor, Occupational Safety & Health Admin., SIC Division Structure, *available at* http://www.osha.gov/pls/imis/sic_manual.html (last visited March 27, 2013). These SIC Codes do not appear to be included or implicated in 40 C.F.R. § 122.26(b)(14). In contrast, the SIC codes for facilities that preserve wood (2491) and for construction of power lines (1623) involving greater than five acres *are* covered by § 122.26(b)(14)(ii) and (x).

that storm water discharges from [major powerline corridors] not be classified as storm water discharges associated with industrial activity, but rather be part of the class of discharges for which storm water permits" are required under Phase II); 55 Fed. Reg. at 48,015 (final rule adopting that approach). If EPA has rejected including major powerline corridors in the definition of "industrial activity," it is reasonable to conclude that EPA did not intend to include individual residential and commercial wooden utility poles in that definition, either.

Fourth, a conclusion that stormwater runoff from the defendants' utility poles is a "discharge associated with industrial activity" could require EPA or the States to regulate stormwater runoff from many other things. If the defendants' utility poles are conveyances that are both "used for collecting and conveying storm water" and "directly related to manufacturing, processing or raw materials storage areas at an industrial plant," then arguably so are playground equipment, bike racks, mailboxes, traffic lights, billboards, and street signs—indeed, anything that might contaminate stormwater. Absent guidance from EPA that says otherwise, regulation of stormwater runoff from such commonplace things would seem to run counter to EPA's measured regulation of stormwater discharges under 33 U.S.C. § 1342(p) and 40 C.F.R. § 122.26(b)(14), and to our practice of reading statutes to "avoid . . . absurd results." *United States v. Tatoyan*, 474 F.3d 1174, 1181 (9th Cir. 2007).

ERF nonetheless contends that we should read 40 C.F.R. § 122.26(b)(14) "expansively" to "include activities analogous to those listed in the regulation." For example, ERF analogizes PG&E's power grid (including utility poles) to steam electric power generating facilities, and its electricity transmission to natural gas transmission. *See* 40 C.F.R.

§ 122.26(b)(14)(iii), (vii) (identifying steam power plants and certain oil and gas transmission facilities as "associated with industrial activity"). However, power plants are plainly "industrial plants," *id.* § 122.26(b)(14), while power grids are not, especially given EPA's decision to exempt "major electrical powerline corridors" from stormwater regulation, *id.* § 122.26(b)(14)(vii). If EPA exempts high voltage transmission lines and associated towers from NPDES permits, it makes even less sense to require them for neighborhood utility poles. As for likening facilities that transmit electricity to those that convey natural gas, § 122.26(b)(14) suggests that it is the substance being transported—petroleum products—that gives rise to the regulation. *See id.* § 122.26(b)(14)(iii) (covering only oil and gas "transmission facilities that discharge storm water contaminated by contact with or that has come into contact with, any overburden, raw material, intermediate products, finished products, byproducts or waste products located on the site of such operations"). The same contamination concerns do not apply to electricity transmission.

Perhaps recognizing how much it asks us to stretch EPA's regulation, ERF alternatively contends that we should "find the regulation invalid as applied to" the defendants' utility poles. Even assuming ERF can bring such a claim in a citizen suit filed under 33 U.S.C. § 1365(a)(1), *see Decker*, 2013 WL 1131708, *7 (discussing limits imposed by 33 U.S.C. § 1369(b)), ERF offers no reasons to invalidate the regulation beyond those it offers to apply the regulation to the defendants' utility poles. As discussed above, those reasons lack merit.

Finally, ERF contends that the CWA requires EPA to regulate stormwater runoff from the defendants' utility poles

even if it is not a "discharge associated with industrial activity." In other words, EPA must require NPDES permits for *all* stormwater discharges. In support, ERF cites *NRDC v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977), in which the D.C. Circuit stated that "Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of [33 U.S.C. § 1311(a)]."

It is impossible, however, to square ERF's view with the language of the statute, which Congress amended ten years after *Costle*. Section 301(a) bars the discharge of pollutants "[e]xcept as in compliance with," among other sections, § 402. Section § 402(p)(2), in turn, identifies specific discharges for regulation in Phase I and then leaves to EPA the task of promulgating Phase II regulations "which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality." 33 U.S.C. § 1342(p)(2), (6). We have repeatedly explained that this language gives EPA the discretion to decide which additional stormwater discharges to regulate. *See Brown*, 617 F.3d at 1194; *Envtl. Def. Ctr.*, 344 F.3d at 842–43; *Am. Mining Cong. v. U.S. EPA*, 965 F.2d 759, 765–66 (9th Cir. 1992); *see also Conservation Law Found. v. Hannaford Bros. Co.*, 327 F. Supp. 2d 325, 330–35 (D. Vt. 2004) (squarely rejecting argument that EPA is required to regulate all stormwater discharges), *aff'd*, 139 Fed. Appx. 338 (2d Cir. 2005). In short, because EPA has chosen not to regulate stormwater runoff from the defendants' utility poles, that runoff is in compliance with the CWA, even if it is discharged without an NPDES permit.

**2. RCRA**

A plaintiff must establish three things in an "imminent and substantial endangerment" citizen suit under RCRA: (1) the defendant has been or is a generator or transporter of solid or hazardous waste, or is or has been an operator of a solid or hazardous waste treatment, storage or disposal facility; (2) the defendant has "contributed" or "is contributing to" the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and, (3) the solid or hazardous waste in question may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B); *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 608 (2d Cir. 1999).

ERF alleges that an "imminent and substantial endangerment" is caused by PCP-based wood preservative that "leak[s], spill[s], and drip[s]" from the defendants' utility poles, and from "[d]ust impregnated with" the preservative that "is blown into the air during dry seasons." Because ERF does not allege that the preservative is "hazardous waste," the "crux of the case turns on the issue of whether [that preservative] is 'solid waste' within the meaning of RCRA." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1041 (9th Cir. 2004). We conclude that it is not.

We begin with RCRA's definition of "solid waste," which is "garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material . . . resulting from industrial, commercial, mining and agricultural operations, and from community activities . . . ." 42 U.S.C. § 6903(27); *see also* 42 U.S.C. § 6901(a)(2) (referring to "scrap, discarded, and waste materials"). The plain meaning of "discard" is to "'cast

aside; reject; abandon; give up.'"  *Safe Air for Everyone*, 373 F.3d at 1041 (quoting 1 The New Shorter Oxford English Dictionary 684 (4th ed. 1993)); *see also Am. Mining Cong. v. U.S. EPA*, 824 F.2d 1177, 1184 (D.C. Cir. 1987) (defining "discarded" as "'disposed of,' 'thrown away' or 'abandoned'" (citation omitted)).  RCRA's definition of "disposal," in turn, is "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water."  42 U.S.C. § 6903(3).  These ambiguous provisions, however, provide little help in deciding whether "solid waste" includes wood preservative that escapes from utility poles.  *See Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1308 (2d Cir. 1993) (lamenting that "'solid waste' plainly means one thing in one part of RCRA and something entirely different in another part of the same statute").

Because the statute is ambiguous, we look to RCRA's legislative history.  *See James v. City of Costa Mesa*, 700 F.3d 394, 399 n.8 (9th Cir. 2012).  Congress enacted RCRA to "eliminate[ ] the last remaining loophole in environmental law" by regulating the "disposal of discarded materials and hazardous wastes."  H.R. Rep. No. 94-1491(I), at 4 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241. RCRA was specifically designed to address the "waste disposal problem," *Am. Mining Cong.*, 824 F.2d at 1186, which was, at base, the high "volume of waste being generated and the capacity to dispose of that waste in the traditional manner," H.R. Rep. No. 94-1491(I), at 9. Accordingly, RCRA covers "waste by-products of the nation's manufacturing processes," as well as manufactured products

> themselves once they have served their
> intended purposes and are no longer wanted
> by the consumer. For these reasons the term
> discarded materials is used to identify
> collectively those substances often referred to
> as industrial, municipal or post-consumer
> waste; refuse, trash, garbage and sludge.

*Id.* at 2. The key to whether a manufactured product is a "solid waste," then, is whether that product "ha[s] served [its] intended purpose[ ] and [is] no longer wanted by the consumer." *Id.*; *see also No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) ("[M]aterial is not discarded until after it has served its intended purpose.").

In this case, ERF is concerned not with wood preservative that is in or on the defendants' utility poles—which clearly is being put to its intended use as a general biocide—but with wood preservative that leaks, spills, or otherwise escapes from the poles. But such escaping preservative is neither a manufacturing waste by-product nor a material that the consumer—in this case, PG&E or Pacific Bell—no longer wants and has disposed of or thrown away. Thus, we conclude that PCP-based wood preservative that escapes from treated utility poles through normal wear and tear, while those poles are in use, is not automatically a RCRA "solid waste."**[8]**

Our conclusion finds support in the case law, EPA's treatment of PCP and other materials under RCRA, and

---

**[8]** We do not hold that PCP or wood preservative that is released into the environment through normal wear and tear can *never* be a "solid waste" under RCRA. *See infra* at 31–32. Our holding in this case turns on the particular allegations in ERF's complaint.

common sense. First, in *No Spray Coalition*, *supra*, the Second Circuit held that "pesticides are not being 'discarded' when sprayed into the air with the design of effecting their intended purpose: reaching and killing mosquitoes and their larvae." 252 F.3d at 150; *cf.* 40 C.F.R. § 261.2(c)(ii) (providing that certain "commercial chemical products . . . are not solid wastes if they are applied to the land and that is their ordinary manner of use"). Like the pesticides in *No Spray Coalition*, wood preservative that has been applied to utility poles to preserve them is being used for its intended purpose, and is not a RCRA "solid waste."

ERF, of course, argues that wood preservative that escapes from utility poles is no longer serving its intended use. But the same can be said of airborne pesticide that drifts beyond its intended target after killing insects. Whatever other liability the pesticide sprayer may have in such a circumstance, we would not ordinarily consider the pesticide as having been "discarded." Indeed, like pesticide applied to a field, preservative that falls to the base of a utility pole still serves its intended purpose by inhibiting the growth of vegetation, fungi, and other organisms. Thus, like other non-hazardous materials, wood preservative that is washed or blown away from utility poles by natural means, as an expected consequence of the preservative's intended use, has not been "discarded."

Second, EPA treats spent munitions under RCRA in the same way—as not having been "discarded" through their normal use:[9]

---

[9] EPA's regulatory definition of "solid waste," 40 C.F.R. § 261.2, applies only to "hazardous waste," a sub-category of "solid waste," and thus defines "solid waste" more narrowly than RCRA. *See* 42 U.S.C.

> EPA disagrees . . . that munitions are a "solid waste" when they hit the ground because they have no further function, unlike pesticides, which continue to have a function on the ground. EPA's interpretation focuses on whether a product was used as it was intended to be used, not on whether the purpose of the product is to perform some function once on the ground. For example, the use of explosives (e.g., dynamite) for road clearing, construction, or mining does not trigger RCRA regulation, even though any residuals on the ground serve no further function.

> Therefore, the Agency is maintaining its position that munitions that are fired are products used for their intended purpose, even when they hit the ground since hitting the ground is a normal expectation for their use.

Military Munitions Rule: Hazardous Waste Identification and Management; Explosives Emergencies; Manifest Exemption

---

§ 6903(27); 40 C.F.R. §§ 261.1(b)(1), 261.2(a)(2)(i)(A), (2)(b), 262.3; *Military Toxics Project v. EPA*, 146 F.3d 948, 951 (D.C. Cir. 1998) (explaining that RCRA's statutory definition of "solid waste" governs imminent endangerment suits). However, we have previously found EPA's application of its regulations relevant when construing the statutory definition of "solid waste." *See Safe Air for Everyone*, 373 F.3d at 1046 n.14 (explaining that, in evaluating whether agricultural grass residue was a "solid waste" under RCRA, it was proper to look to cases applying EPA's regulatory definition, as "challenges to EPA's regulation of particular items . . . necessarily address whether those items were within RCRA's statutory definition of 'solid waste' as 'discarded material,' the same definition at issue here").

for Transport of Hazardous Waste on Right-of-Ways on Contiguous Properties, 62 Fed. Reg. 6,622, 6,630 (Feb. 12, 1997) (codified at 40 C.F.R. § 266.202).

Third, in 2008, EPA approved the use of PCP under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y, as a wood preservative for utility poles, railroad ties, and pilings.  As part of the approval process, EPA studied the available literature regarding PCP, assessed its potential hazards, and solicited public comments.  EPA explained that PCP, despite being present in roughly 36 million utility poles across the country, presented no "unreasonable adverse risks to humans or the environment," with no expected "dietary or drinking water exposures based on the registered use patterns."  It would be odd for EPA to approve PCP-based wood preservative for use in utility poles under FIFRA if the agency believed that preservative put to that use and expectedly released from the poles was a "solid waste" under RCRA.

Fourth, under RCRA, EPA *does* regulate as "hazardous" (and thus "solid") waste:

- "Wastes" from PCP manufacturing processes;

- "Discarded unused formulations" containing PCP;

- "Wastewaters . . . , process residuals, preservative drippage, and spent formulations from wood preserving processes generated at [wood treatment] plants that currently use or have previously used" PCP; and

- "Bottom sediment sludge from the treatment of wastewaters from wood preserving processes that use creosote and/or [PCP]."

40 C.F.R. § 261.31(a)(Table – F021, F027, F032), 261.32 (Table – K001).  However, EPA does *not* regulate "those [PCP] formulations which are used," including "[PCP] which is impregnated in treated wood (e.g., posts, poles, and railroad ties)" and "dirt contaminated with PCP, . . . unless the contamination were the result of a spill of unused PCP."  U.S. EPA, "Regulatory Status of Various Types of Pentachlorophenol Wastes," RCRA Online No. 11256 (June 19, 1987), *available at* http://yosemite.epa.gov/osw/rcra.nsf /0c994248c239947e85256d090071175f/b30c860b7bf78f3f 8525670f006bd7ef!OpenDocument (last visited March 27, 2013).

We recognize that EPA's decision not to regulate PCP-based preservative that drips from treated wooden utility poles as "hazardous waste" does not by itself mean the substance is not a "solid waste" under RCRA, since EPA's regulatory definition of "solid waste" is narrower than the statutory definition.  *See supra* at 27–28 n.9.  However, in the absence of a more definitive statement from EPA, its treatment of PCP and wood preservatives generally supports our conclusion that PCP-based wood preservative that escapes from utility poles through normal wear and tear, while those poles are in use, is not a RCRA "solid waste."

Finally, common sense compels what RCRA, the case law, and EPA regulations and guidance imply.  As with ERF's CWA claim, accepting ERF's characterization of preservative that seeps from wooden utility poles as a RCRA "solid waste" would lead to untenable results.  As of 2008,

there were 36 million utility-owned wood poles in service across the United States that have been treated with PCP. It defies reason to suggest that each of those poles, while in use, is producing "solid waste" under RCRA, and thus must be replaced. Indeed, if ERF is correct, everything from wood preservative that leaches from railroad ties to lead paint that naturally chips away from houses[10] would be "solid waste," and thus potentially actionable under 42 U.S.C. § 6972(a)(1)(B). Absent contrary EPA guidance to which we might defer, the more tenable reading of RCRA is the one we have given it: PCP-based wood preservative that is released into the environment as a natural, expected consequence of its intended use—as a preservative for wooden utility poles—is not automatically "solid waste" under RCRA's definition of that term.

We include the word "automatically" to reflect what we are *not* deciding today. Because ERF does not allege that dangerous accumulations of PCP have resulted from the natural discharge of wood preservative from the defendants' utility poles, we do not decide whether or under what circumstances PCP, wood preservative, or another material becomes a RCRA "solid waste" when it accumulates in the environment as a natural, expected consequence of the

---

[10] EPA is considering regulating lead-based paint debris under a different statute, but RCRA remains the current management tool. *See* 40 C.F.R. §§ 257.2, 258.2 (defining "lead-based paint waste"); U.S. EPA, Regulatory Status of Waste Generated by Contractors and Residents from Lead-Based Paint Activities Conducted in Households, *available at* http://www.epa.gov/lead/fslbp.html (Aug. 2000) (last visited March 27, 2013). Notably, EPA regulates lead-based paint *waste* generated and disposed of during residential construction and refurbishment activities, *see id.*, but not lead-based paint that falls from houses through ordinary wear and tear.

material's intended use. *See* U.S. EPA, Best Management Practices for Lead at Outdoor Shooting Ranges, EPA-902-B-01-001, at I-8 (June 2005) *available at* http://www.epa.gov/lead/pubs/epa_bmp.pdf (last visited March 27, 2013) ("[S]pent lead shot (or bullets), left in the environment, is subject to the broader definition of solid waste written by Congress."); *Conn. Coastal Fishermen's Ass'n*, 989 F.2d at 1316 (holding that materials "left to accumulate long after they ha[d] served their intended purpose"—specifically, five million pounds of lead bullets and 11 million pounds of clay target debris accumulated for nearly 70 years at a firing range—met RCRA's statutory definition of "solid waste" (quotation marks omitted)); *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1222 (D. Or. 2009) (reaching same conclusion with respect to lead shot that had accumulated at a firing range since 1955). In this case we decide only that wood preservative that escapes from wooden utility poles as those poles age has not itself been "discarded," and therefore is not a "solid waste," under RCRA.

## B.  Dismissal under Rule 12(b)(1)

PG&E argues that dismissal of ERF's complaint was alternatively appropriate because ERF's allegations are insufficient on their face to invoke federal subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). PG&E argues that ERF's pre-suit notice letters did not identify the location of each utility pole at issue, and that ERF could not use its January 2010 notice letter to "supplement" the claims set forth in ERF's June 2009 notice letter and first amended complaint.  The district court concluded that PG&E's

argument lacked merit. *See Ecological Rights Found.*, 803 F. Supp. 2d at 1060–61. We agree.

Pursuant to EPA regulations, the CWA requires that a notice

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). RCRA imposes almost identical requirements. *See id.* § 254.3(a). ERF's notices provided such "sufficient information." ERF's June 2009 notice letter stated that it

> pertains to each and every Pole located in San Francisco, Alameda, Contra Costa, and Marin counties, to the extent the Pole has been treated with the above-referenced oil-pentachlorophenol mixture. PG&E maintains an extensive database with information about the treatment method used on every Pole it owns. . . . Given PG&E's ownership, control and usage of the Poles, PG&E knows the location of each of these Poles. These Poles include, but are not limited to, the Poles identified in the attached Exhibits A and B. The itemization of Poles in Exhibits A and B

> are provided by way of example to illustrate ERF's concern with the Poles; there are thousands of additional Poles that have been treated with the above-referenced oil-pentachlorophenol mixture and to which this Notice pertains.

In arguing that ERF's notices were insufficient, PG&E reads the relevant regulations—in particular, the requirement that a notice identify "the location of the alleged violation"—too literally. We have explained that,

> as long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement. The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002); *see also Cmty. Ass'n for Restoration of the Env't*, 305 F.3d at 951 ("Neither the CWA nor the EPA's regulations require plaintiffs to provide an exhaustive list of all violations."). ERF's notice that preservative-treated utility poles owned by PG&E and/or other entities in four counties allegedly discharged pollutants during days of significant precipitation was sufficient to advise PG&E of ERF's claims, especially where ERF identified representative poles and referenced PG&E's superior ability to ascertain the locations of other poles that might be at issue. *See San Francisco Baykeeper*, 309 F.3d at 1158 ("Tosco is obviously in a better position than

BayKeeper to identify the exact dates, or additional dates, of its own ship loading."); *Paolino v. JF Realty, LLC*, — F.3d — , 2013 WL 951257, at *4 (1st Cir. Mar. 13, 2013) ("[T]he appropriate measure of sufficiency under § 135.3(a) is whether the notice's contents place the defendant in a position *to remedy* the violations alleged.").

PG&E's second argument—that ERF could not rely on its third notice letter and second amended complaint to cure its deficient initial notice letter and complaint—also is unpersuasive. One, PG&E did not raise this argument in its Rule 12(b)(1) motion. Two, as discussed above, ERF's notice letters were not deficient. Three, the only differences between ERF's first and third notice letters were that the third letter added responsible parties and discussed poles treated with any chemical preservative, not just PCP. Yet ERF's second amended complaint is concerned only with PCP-treated poles. Finally, ERF sent its third notice letter on January 6, 2010, but did not file its second amended complaint until June 21, 2010. PG&E cannot complain that it did not have time to decide whether and how to respond to ERF's allegations. *See Ctr. for Biological Diversity*, 566 F.3d at 800–01 (explaining that the purpose of the notice requirement is to allow an alleged violator the opportunity to comply with the law).

## C.  Dismissal without leave to amend

ERF argues that it should be allowed to amend its complaint to allege that (1) the defendants' utility poles discharge wood preservative directly into waters of the United States; (2) preservative-contaminated stormwater discharges from the utility poles "flows into storm drains, ditches, and culverts and from these conveyances into waters

of the United States;" and (3) certain conduct, such as brushing up against and drilling holes into the utility poles, causes preservative-laden "waste" to be "deposited into the environment."

We consider five factors in assessing whether a district court abuses its discretion in dismissing a complaint without leave to amend: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). Although a district court "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), the court's discretion to deny such leave is "particularly broad" where the plaintiff has previously amended its complaint, *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004) (quotation marks omitted).

Here, there is no evidence of bad faith or risk of prejudice, but there have been undue delay and previous amendments. As discussed above, ERF did not raise its additional allegations until this appeal, despite twice amending its complaint. However, ERF's biggest obstacle is futility. Regarding the CWA, first, because ERF's notice letters do not allege that the defendants' utility poles directly discharge wood preservative into waters of the United States, ERF cannot assert that claim in this lawsuit. Second, even if ERF had alleged that stormwater discharges from the utility poles are collected and then conveyed to waters of the United States, such discharges are not "associated with industrial activity." Regarding RCRA, a claim that preservative-laden pieces or shavings from utility poles are dislodged when people brush up against or drill into utility poles still involves a release that is a natural, expected consequence of the

preservative's intended use; such pieces or shavings therefore are not discarded "solid waste" under RCRA.

ERF already had three chances to assert its claims, and no claim that ERF has asserted or could assert on remand is a claim upon which relief may be granted under the CWA or RCRA. *Cf. Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 n.3 (9th Cir. 2011) ("Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." (quotation marks omitted)). Dismissal without leave to amend therefore was appropriate.

**AFFIRMED.**

HURWITZ, Circuit Judge, concurring in part and concurring in the result:

I concur in the majority opinion except insofar as it holds that utility poles cannot be point sources for purposes of the Clean Water Act under circumstances not presented by this case. *See supra* pp. 11–16. Resolution of this difficult issue is entirely unnecessary, given the opinion's conclusion – which I join – that the defendants' utility poles are not "associated with industrial activity." *See supra* pp. 18–23.