09-0097-cv
Peconic Baykeeper, Inc. v. Suffolk County

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: December 15, 2009                    Decided: March 30, 2010)

Docket No. 09-0097-cv

_____

PECONIC BAYKEEPER, INC., KEVIN MCALLISTER, ALFRED CHIOFOLO,

*Plaintiffs-Appellants*,

−v.−

SUFFOLK COUNTY, SUFFOLK COUNTY DEPARTMENT OF PUBLIC WORKS, DIVISION OF VECTOR CONTROL,

*Defendants-Appellees*.

_____

Before :

CABRANES, PARKER,

*Circuit Judge*s,

AND CASTEL,

*District Judge.**

_____

Appeal from a judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*) upholding the defendants' mosquito-control activities as lawful under the Clean Water Act, 33 U.S.C. § 1251, et seq.  The judgment of the district court is vacated insofar as it held that the defendants' spraying activities were

_____

* The Honorable P. Kevin Castel, United States District Judge for the Southern District of New York, sitting by designation.

uniformly in compliance with the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136, et seq.; vacated insofar as it held, in the alternative, that the trucks and helicopters used to spray the pesticides were not "point sources" for the purposes of the CWA; and affirmed insofar as it held that the County's dredging activities did not violate the CWA.

_____

DANIEL E. ESTRIN, Pace Environmental Litigation Clinic, Inc., White Plains, NY (Matthew R. Atkinson, Atkinson & Heffron LLP, *of counsel*)
        *for Plaintiffs-Appellants*.

CHRISTOPHER A. JEFFREYS, Assistant Suffolk County Attorney (Christine Malfi, Suffolk County Attorney, *on the brief*) Suffolk County Attorney's Office, Hauppage, NY
        *for Defendants-Appellees*.

_____

CASTEL, *District Judge*:

Defendants Suffolk County and the Suffolk County Department of Public Works, Division of Vector Control (collectively, the "County") employ various measures to combat the spread of mosquito-borne illnesses, including the use of pesticides intended to kill adult mosquitoes in mid-flight. Plaintiffs Peconic Baykeeper, Inc., Kevin McAllister and Alfred Chiofolo contend that the County has violated the Clean Water Act (the "CWA"), 33 U.S.C. § 1251, et seq., in its application of certain pesticides, and, separately, its dredging of mosquito ditches. Plaintiffs, who commenced this action under the CWA's citizen-suit provision, 33 U.S.C. § 1365(a)(1), sought declaratory and injunctive relief, as well as civil penalties to be paid to the United States Treasury. Following a six-day bench trial, the district court found that the disputed mosquito-control activities were lawful under the CWA. Judgment was entered for the defendants, and plaintiffs now appeal.

For the reasons stated below, we affirm in part on an alternate ground not reached by the district court, vacate the judgment in part, and remand to the district court for further

proceedings consistent with this opinion.

Background

We begin by surveying the origins of the County's mosquito-control efforts. In 1993, the County found a presence of mosquito-borne disease for the first time in 75 years. There have since been approximately thirty reported cases of mosquito-transmitted illness in the County, four of which resulted in death. West Nile Virus is the County's most common mosquito-borne illness, but there have been instances of malaria transmittal, including the infection of two children in 1999. Officials also feared an outbreak of Eastern Equine Encephalitis, a rare disease with high fatality rates that is known to be carried by mosquitoes in the northeastern United States. The rise in mosquito-borne illnesses prompted the New York State Commissioner of Health to declare a public health threat in Suffolk County in 1994, 1996 and 1999-2006.

Mosquitoes generally breed in stagnant waters, such as marsh areas. The County has employed different tactics to curb the mosquito population. It has used numerous pesticides, including two marketed under the brand names Scourge and Anvil. The County sprayed Scourge and Anvil in ultra-low volume ("ULV") aerosol mists through apparatuses attached to trucks and helicopters. When sprayed in ULV form, Scourge and Anvil create a "fog cloud" that envelops and kills mosquitoes.

The labels for Scourge and Anvil were approved by the Environmental Protection Agency (the "EPA") pursuant to the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, et seq., which is the statutory regime governing the labeling and use of pesticides. Under the heading "Environmental Hazards," Scourge's label states in part:

This pesticide is highly toxic to fish. For terrestrial uses, do not apply directly to

3

water, to areas where surface water is present or to intertidal areas below the mean high water mark. Drift and runoff from treated sites may be hazardous to fish in adjacent waters. Consult your State's Fish and Wildlife Agency before treating such waters.

As to ULV applications, the Scourge label states: "Spray parks, campsites, woodlands, athletic fields, golf courses, swamps, tidal marshes, residential areas and municipalities around the outside of apartment buildings, restaurants, stores and warehouses. Do not spray on cropland, feed or foodstuffs. Avoid direct application over lakes, ponds and streams." As understood by the County, the phrase "[a]void direct application over" when used in reference to ponds and streams requires the County to turn off ULV jets when aircraft fly above bodies of fresh water. The Anvil label contains similar restrictions against applications "directly to water, or to areas where surface water is present or to intertidal areas below the mean high water mark," and also allows spraying in, among other areas, "swamps" and "marshes."

In carrying out its mosquito-control measures, the County is under the oversight of the New York State Department of Environmental Conservation (the "DEC"), an agency with EPA-delegated authority to enforce the CWA in the state. N.Y. Envir. Conserv. L. § 17-0801 (authorizing New York State to issue CWA permits); 33 U.S.C. § 1342(b) (authorizing approved states to issue CWA permits). As part of its CWA enforcement powers, the DEC issues State Pollutant Discharge Elimination System ("SPDES") permits. N.Y. Envir. Conserv. L. § 17-0701. In authorizing the discharge of a pollutant, an SPDES permit is equivalent to a National Pollutant Discharge Elimination System ("NPDES") permit issued by the EPA pursuant to the CWA. See 33 U.S.C. §§ 1311(a), 1342(b).

The DEC reviewed and approved maps delineating the area to be sprayed by the County. The DEC also gave the County guidance as to whether it was required to receive an

4

SPDES permit prior to spraying, or whether the pesticide application was exempt from the CWA's permitting requirement. The DEC advised the County that so long as its spraying complied with the FIFRA label, the CWA did not require issuance of an SPDES permit prior to the application of pesticides. The DEC reached this conclusion as early as 2001, and directed the County accordingly. The EPA later codified the principle that an application of pesticides consistent with FIFRA labeling did not constitute the discharge of a pollutant, and therefore did not violate the CWA, first through an Interim Statement, 68 Fed. Reg. 48,385 (Aug. 13, 2003), and then in a Final Rule, 40 C.F.R. § 122.3(h).

The district court found that the County's application of Scourge and Anvil fully conformed with the FIFRA labeling. It held that FIFRA-compliant spraying activity did not amount to the discharge of a pollutant into navigable waters from a point source, and therefore did not violate the CWA. See 33 U.S.C. §§ 1311(a), 1362(12). The district court also held that the spraying activity was consistent with the CWA because the application of pesticides via spray jets attached to trucks and helicopters did not amount to discharge from a "point source," as that phrase is defined in the statute.

Separate from the ULV administration of pesticides, the County also maintains a network of mosquito ditches, the purpose of which is to drain surface waters from marshlands and thereby reduce mosquito breeding grounds. Originally constructed in the 1930s, the County's grid of mosquito ditches also provide a habitat for native fish species, such as killies, that eat mosquito larvae. Plaintiffs contended that certain of the County's dredging activities, purportedly undertaken in an effort to maintain the ditches, discharged dredged matter such as silt and foliage into the waters, and did not fall within the CWA's permitting exemption for the maintenance of drainage ditches as set forth at 33 U.S.C. § 1344(f)(1)(C). They also asserted

5

that the County dug new maintenance ditches, so that the dredging activities brought "an area of navigable waters into a use to which it was not previously subject," triggering the statute's recapture provision and requiring an SPDES. 33 U.S.C. § 1344(f)(2).

The district court held that the mosquito ditches constituted "drainage ditches" under the CWA, and rejected testimony, in part on credibility grounds, that the defendants were dredging new ditches. As a result, the district court concluded that the County's ditch-maintenance activities were exempt from the SPDES permitting requirement, and that the County did not run afoul of the statute's recapture provision, which "removes the availability of the . . . exemption" when an area of navigable waters is brought into a new use. 33 U.S.C. §§ 1344(f)(1)(C) & (f)(2); June v. Town of Westfield, NY, 370 F.3d 255, 258 n.3 (2d Cir. 2004).

Standard of Review

We review a district court's findings of fact following a non-jury trial under a clearly erroneous standard. Fed. R. Civ. P. 52(a)(6); Ceraso v. Motiva Enters., LLC, 326 F.3d 303, 316 (2d Cir. 2003). A district court's application of law to the facts is reviewed de novo. Henry v. Champlain Enters., 445 F.3d 610, 617-18 (2d Cir. 2006).

Discussion

I. The Lawfulness of the County's Spraying of Pesticides.

A. FIFRA-Compliant Spraying.

Because the district court based its holding principally on the conclusion that the County's spraying activities complied with FIFRA and therefore were lawful under the CWA, we begin by reviewing the two statutes.

FIFRA functions as "a comprehensive scheme to regulate the use, sale and labeling, of pesticides – partly through EPA registration of the substances, including review,

6

suspension and cancellation of registration." N.Y. State Pesticide Coal., Inc. v. Jorling, 874 F.2d 115, 117 (2d Cir. 1989).  Under FIFRA, it is unlawful "to use any registered pesticide in a manner inconsistent with its labeling."  7 U.S.C. § 136j(a)(2)(G).  The EPA has had authority over implementation of FIFRA's label-registration process since 1970.  See Bates v. Dow Agrosciences L.L.C., 544 U.S. 431, 437 (2005).

The EPA also has authority over the implementation of the CWA.  33 U.S.C. § 1251(d).  Enacted by Congress in 1972, the CWA's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  It prohibits "the discharge of any pollutant by any person," unless done in compliance with a provision of the statute.  33 U.S.C. § 1311(a).  The phrase "discharge of a pollutant" is defined to mean "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  The word "pollutant," in turn, is defined as including "chemical wastes."  33 U.S.C. § 1362(6).  The CWA does not define the phrase "chemical wastes."

The statute's prohibition against the addition of a pollutant into navigable waters is qualified by the EPA's power to issue NPDES permits.  See 33 U.S.C. § 1342(a).  Section 1342(a)(1) authorizes the EPA to "issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this Title," subject to a public hearing and certain other conditions.  It also grants the EPA power to allow states to implement their own CWA permitting regimes.  33 U.S.C. § 1342(b).  In the State of New York, an SPDES permit issued by the DEC has the same force as an NPDES permit issued by the EPA.  See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 486 (2d Cir. 2001) ("In New York, the NPDES program is administered by NYSDEC and referred to as the State Pollution Discharge Elimination System ('SPDES').").

7

In 2003, the EPA issued its Interim Statement attempting to give guidance on FIFRA compliance and NPDES permitting. The Interim Statement concluded that a label-compliant application of pesticides "to control pests that are present over waters of the United States that results in a portion of the pesticides being deposited to waters" does not require an NPDES permit. 68 Fed. Reg. at 48387. It reasoned that pursuant to FIFRA, the EPA is charged with considering whether a pesticide will perform its intended function without having an unreasonably adverse effect on the environment. Id. The Interim Statement noted that the CWA defines "chemical wastes" as one category of "pollutant," but concluded that FIFRA-approved pesticides applied according to their labeling cannot constitute "chemical wastes" because they are "EPA-evaluated products designed, purchased and applied to perform their intended purpose of controlling target organisms in the environment." 68 Fed. Reg. at 48388.

The reasoning of the Interim Statement was formally adopted by the EPA in 2005, when it issued the Final Rule. The Final Rule stated in relevant part that an NPDES permit was not required for "[t]he application of pesticides consistent with all relevant requirements under FIFRA (i.e., those relevant to protecting water quality) . . . ." 40 C.F.R. § 122.3(h). As an example, the Final Rule cited the following as an instance of FIFRA-compliant spraying that would not require an NPDES permit:

> The application of pesticides to control pests that are present over waters of the United States, including near such waters, where a portion of the pesticides will unavoidably be deposited to waters of the United States in order to target the pests effectively; for example, when insecticides are aerially applied to a forest canopy where waters of the United States may be present below the canopy or when pesticides are applied over or near water for control of adult mosquitoes or other pests.

Id. § 122.3(h)(2).

Less than two months after judgment was entered by the district court in this case,

8

the Sixth Circuit vacated the EPA's Final Rule as contrary to the text of the CWA. Nat'l Cotton Council of Am. v. E.P.A., 553 F.3d 927 (6th Cir. 2009). The petitioners in National Cotton Council included plaintiff Peconic Baykeeper, Inc., whose timely petition to this Court was consolidated by the Judicial Panel on Multidistrict Litigation with petitions pending in the Sixth Circuit. Id. at 932 & n.3. In vacating the EPA's Final Rule, the Sixth Circuit held that the application of pesticides "'above' or 'near' waterways" that leave "excess" or "residual" pesticide in navigable waters meets the CWA's definition of "chemical waste." Id. at 936-37. For this, among other reasons, the Sixth Circuit concluded that the Final Rule was contrary to the CWA's text and must be vacated. Id. at 940.

After the Sixth Circuit ruled in National Cotton Council, the EPA moved to stay the mandate. It argued, among other things, that immediate issuance of a mandate vacating the Final Rule would be unduly disruptive to state and federal permitting authorities and would trigger a rash of citizen suits. The Sixth Circuit granted the EPA's motion, and stayed issuance of the mandate until April 9, 2011. Case No. 06-4630 (6th Cir. June 8, 2009). The EPA has publicly announced that it "plans, before the ruling takes effect (April 9, 2011), to issue a final general NPDES permit for covered pesticide applications," and to help develop new state-level permitting plans. See National Pollution Discharge Elimination System (NPDES), Court Grants EPA 2-Year Stay, http://cfpub.epa.gov/NPDES/HOME.CFM?PROGRAM_ID=41 (last visited Mar. 29, 2010). The EPA has not sought further review of the National Cotton Council ruling, and the Supreme Court has denied petitions for certiorari filed by certain industry intervenors. See CropLife Am. v. Baykeeper, 78 U.S.L.W. 3479 (U.S. Feb. 22, 2010) (No. 09-533); Am. Farm Bureau Fed'n v. Baykeeper, 78 U.S.L.W. 3479 (U.S. Feb. 22, 2010) (No. 09-547).

We express no views on the reasoning of National Cotton Council. However, in

9

light of the Sixth Circuit's stay of mandate, the Final Rule remains in force through April 9, 2011. Therefore, if the EPA adheres to its expressed intent, then by April 9, 2011, the EPA and state authorities will have implemented a new permitting framework for the application of pesticides. In the interim, the application of pesticides consistent with the Final Rule remains lawful.

In the district court, plaintiffs sought a declaratory judgment that the County's spraying of pesticides violated the CWA, 33 U.S.C. §§ 1311, 1342. The Declaratory Judgment Act confers on federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995); 28 U.S.C. § 2201(a) ("Any court may declare the rights and other legal relations of any interested party . . . .") (emphasis added). "The propriety of issuing a declaratory judgment may depend upon equitable considerations and is also informed by the teachings and experience concerning the functions and extent of federal judicial power." Green v. Mansour, 474 U.S. 64, 72 (1985) (citation and quotation marks omitted). Among the relevant considerations in exercising discretion is "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

Equitable considerations counsel against declaring the rights of the parties as to past spraying in compliance with the EPA's interim guidance and its Final Rule. Spraying that occurs prior to expiration of the Sixth Circuit's stay of mandate, and is consistent with the EPA-approved FIFRA labeling, remains in compliance with the Final Rule. Once the stay of mandate expires, a yet-to-be finalized CWA permitting system will govern the application of pesticides. Similarly, because the stay of mandate maintains the status quo, and the EPA has expressed the

10

intent to establish a nationwide permitting process, injunctive relief is unnecessary to prevent the alleged ongoing or future violations. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 316 (1982) (CWA does not require injunctive relief, and permits courts to "contemplate[ ] the exercise of discretion and balancing of equities" in crafting injunctive relief). Because defendants' FIFRA-compliant spraying is not contrary to governing regulatory standards, there likewise is no basis to impose civil penalties pursuant to the relevant CWA provision, 33 U.S.C. § 1319(d). See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185-86 (2000) (upon a finding of violation, CWA civil penalties are levied to enforce immediate compliance and deter future violations).

This does not, however, end our review of the district court's findings with respect to the County's spraying activities made in purported compliance with FIFRA. Although the record indicates that the defendants' application of pesticides was, in the main, consistent with the EPA-approved FIFRA label, it also reveals instances of aerial spraying over creeks. Such spraying may have been contrary to the relevant FIFRA labeling of Scourge and Anvil, which respectively forbid "direct application over lakes, ponds and streams" or "areas where surface water is present . . . ." The district court acknowledged the existence of evidence that the County may have sprayed above various creeks, but did not adequately explain the basis for its finding that the County fully complied with the pesticides' label instructions.

Not all spraying activity above or near water is at variance with the FIFRA labeling. For instance, spraying above the "mean high water mark" of a coastline is permissible under the labeling of Anvil. Scourge allows for application "as a mosquito adulticide in . . . swamps [and] tidal marshes . . . ." The district court also heard testimony that pursuant to DEC guidance, the County operated with different restrictions for spraying activities in or around tidal

11

wetlands, as opposed to freshwater wetlands. It also may be that the "creeks" identified in the record are not bodies of water covered by the labeling because, for example, they may be classified as "tidal marshes."[1] Because the district court did not explain the basis for its conclusion that all spraying was in compliance with the FIFRA label, the judgment of the district court is vacated insofar as it held that the County's spraying activities were uniformly in compliance with the FIFRA requirements, and the case is remanded for further factfinding. The district court may, in the exercise of discretion, allow the trial record to be reopened.

### B. The District Court's Alternate Holding as to Point Sources.

As an independent basis for finding all spraying activities lawful under the CWA, the district court concluded that the County's spray applicators attached to trucks and helicopters were not "point sources." The district court reasoned that because the trucks and helicopters discharged pesticides into the air, any discharge was indirect, and thus not from a point source.

We disagree. Under the CWA, a "point source" is defined as "any discernable, confined and discrete conveyance, including but not limited to any . . . container, rolling stock . . . or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The "'definition of a point source is to be broadly interpreted'" and "'embrac[es] the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States.'" Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 219 (2d Cir. 2009) (quoting Dague v. City of Burlington, 935 F.2d 1343, 1354-55 (2d Cir. 1991)); see also Concerned Area Residents for Env't v. Southview Farm, 34 F.3d 114, 118-19 (2d Cir. 1994) (a truck with attached manure spreader qualified as "rolling stock" or a "container" and therefore

---

[1]The definition of "creek" includes "[a] narrow recess or inlet in the coast-line of the sea," as well as "any narrow arm or corner of the sea." 3 Oxford English Dictionary 1142 (2d ed. 1989).

12

was a "point source"); League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1185 (9th Cir. 2002) (the CWA's definition of point source "encompasses an aircraft equipped with tanks spraying pesticide from mechanical sprayers directly over covered waters."). Here, the spray apparatus was attached to trucks and helicopters, and was the source of the discharge. The pesticides were discharged "from" the source, and not from the air. The word "from" is defined "to indicate a starting point," and also denotes the "source or original or moving force of something . . . ." Webster's Third International Dictionary Unabridged 913 (2002). The district court's conclusion that the pesticides were not discharged from a point source was in error.

## II. The Lawfulness of the County's Dredging Activities.

Separate and apart from the County's use of pesticides, the plaintiffs challenged the County's dredging of its mosquito ditches. "Dredged spoil" is one category of pollutants recognized in the CWA. 33 U.S.C. § 1362(6). Unless otherwise excepted, their discharge into navigable waters requires an NPDES permit. 33 U.S.C. § 1311(a). However, the CWA sets forth categories of "[n]on-prohibited discharge of dredged or fill material." 33 U.S.C. § 1344(f). This includes materials dredged for "the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(C).

The district court concluded that the County's activities as to mosquito ditches, which were dug in the 1930s to drain water from wetlands in order to reduce mosquito breeding grounds, were lawful under the CWA and did not require a permit. The district court found that "[t]he purpose of the ditches originally was to reduce mosquito production both by draining off surface water and by introducing fish into the areas where mosquitoes would breed." It held that the mosquito ditches were therefore "drainage ditches," and that no credible evidence supported plaintiffs' contention that the County created new mosquito ditches. This finding, based in part

13

on an assessment of witness credibility, was not clearly erroneous. Because the CWA establishes a permit exemption for the maintenance of drainage ditches, and the ditches had as their purpose the draining of surface waters, we agree with the district court that the County's maintenance activities were exempt from the CWA's permit requirements. 33 U.S.C. § 1344(f)(1)(C). The record also supports the conclusion that the County's activities did not "bring[] an area of the navigable waters into a use to which it was not previously subject," and thus did not fall within the CWA's recapture provision, which would require an SPDES permit for areas of navigable waters brought into new use. 33 U.S.C. § 1344(f)(2); June, 370 F.3d at 258 n.3.

Plaintiffs also challenged work performed in 2000 at one location, the William Floyd Estate, contending that it included the digging of new ditches. The record indicates that the DEC issued a notice of violation for this work. The district court found as a fact that the work at the William Floyd Estate was performed pursuant to permits issued by the DEC and Army Corps of Engineers. At trial, the district court heard testimony of a County employee who testified that the work occurred pursuant to a nationwide permit from the Army Corps of Engineers, and that the U.S. Fish and Wildlife Service sponsored the project and obtained necessary permits. The district court's finding was not clearly erroneous.

Conclusion

For the reasons stated above, we hold as follows:

(1) We VACATE the judgment of the district court insofar as it held that the County's spraying activities were uniformly in compliance with the FIFRA requirements;

(2) We VACATE the judgment of the district court insofar as it held, in the alternative, that the trucks and helicopters used to spray the pesticides were not "point sources"

14

for the purposes of the CWA; and

(3) We AFFIRM the judgment of the district court insofar as it held that the County's dredging activities did not violate the CWA.

Any appeal from a subsequently entered final judgment should be referred to this panel.