CLAY, Circuit Judge, concurring in part and dissenting in part.
 

 CONCURRING IN PART AND DISSENTING IN PART
 

 Can a polluter escape liability under the Clean Water Act ("CWA"),
 
 33 U.S.C. §§ 1251
 
 - 1387, by moving its drainage pipes a few feet from the riverbank? The Fourth and Ninth Circuits have said no. In two cases today,
 
 [1]
 
 the majority says yes. Because the majority's conclusion is contrary to the plain text and history of the CWA, I respectfully dissent from the majority's conclusion that Plaintiffs' CWA claim was properly dismissed. Meanwhile, I concur in the majority's determination that the district court erred by dismissing Plaintiffs' claim under the Resource Conservation and Recovery Act ("RCRA").
 

 Plaintiffs have invoked the citizen-suit provision of the CWA, which provides that "any citizen may commence a civil action ... against any person ... who is alleged to be in violation of ... an effluent standard or limitation under this chapter[.]"
 
 33 U.S.C. § 1365
 
 (a). "For purposes of this section, the term 'effluent standard or limitation under this chapter' means," among other possibilities, "an unlawful act under subsection (a) of section 1311 of this title." § 1365(f). In turn, § 1311(a) prohibits "the discharge of any pollutant by any person[.]"
 

 The broad sweep of a defendant's potential CWA liability is limited in two ways. First, Congress included a list of exceptions in § 1311(a) itself: the discharge of a pollutant is unlawful "[e]xcept in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title." Second, Congress gave the phrase "discharge of a pollutant" a very specific definition: it means "any addition of any pollutant to navigable waters from any point source."
 
 33 U.S.C. § 1362
 
 (12)(A). Taken together, Congress thus authorized citizen suits to prevent the "addition of any pollutant to navigable waters from any point source,"
 
 see
 
 § 1362(12)(A), but if a listed statutory exception applies,
 
 see
 
 § 1311(a).
 

 The majority argues that this standard cannot be satisfied when, as here, pollution travels briefly through groundwater before reaching a navigable water. Plaintiffs counter that such an exception has no statutory
 basis and would allow polluters to shirk their CWA obligations by placing their underground drainage pipes a few feet away from the shoreline. This case could have profound implications for those in this Circuit who would pollute our Nation's waters. And the issue is novel. This Court has never before considered whether the CWA applies in this context.
 

 However, the Fourth and Ninth Circuits have. Both courts determined that a short journey through groundwater does not defeat CWA liability.
 
 See
 

 Upstate Forever v. Kinder Morgan Energy Partners, L.P.
 
 ,
 
 887 F.3d 637
 
 , 649-51 (4th Cir. 2018) ;
 
 Hawai'i Wildlife Fund v. Cty. of Maui
 
 ,
 
 886 F.3d 737
 
 , 745-49 (9th Cir. 2018). The Second Circuit reached a similar conclusion where the pollutants traveled briefly through fields (which are not necessarily point sources) and through the air.
 
 See
 

 Concerned Area Residents for Env't v. Southview Farm
 
 ,
 
 34 F.3d 114
 
 , 118-19 (2d Cir. 1994) (fields);
 
 Peconic Baykeeper, Inc. v. Suffolk Cty.
 
 ,
 
 600 F.3d 180
 
 , 188-89 (2d Cir. 2010) (air). Until today, no Circuit had come out the other way. The reason is simple: the CWA does not require a plaintiff to show that a defendant discharged a pollutant from a point source
 
 directly
 
 into navigable waters; a plaintiff must simply show that the defendant "add[ed] ... any pollutant
 
 to
 
 navigable waters
 
 from
 
 any point source."
 
 See
 
 §§ 1362(12)(A) (emphases added), 1365(a), 1311(a);
 
 Upstate Forever
 
 ,
 
 887 F.3d at
 
 650 ;
 
 Hawai'i Wildlife Fund
 
 ,
 
 886 F.3d at 749
 
 .
 

 The Supreme Court addressed this precise issue in
 
 Rapanos v. United States
 
 ,
 
 547 U.S. 715
 
 ,
 
 126 S.Ct. 2208
 
 ,
 
 165 L.Ed.2d 159
 
 (2006). There, Justice Scalia's plurality opinion was explicit:
 

 The Act does not forbid the "addition of any pollutant
 
 directly
 
 to navigable waters from any point source," but rather the "addition of any pollutant
 
 to
 
 navigable waters." [ 33 U.S.C.] § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant
 
 that naturally washes downstream
 
 likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between.
 
 United States v. Velsicol Chemical Corp.
 
 ,
 
 438 F.Supp. 945
 
 , 946-947 (W.D.Tenn. 1976) (a municipal sewer system separated the "point source" and covered navigable waters). See also
 
 Sierra Club v. El Paso Gold Mines, Inc.
 
 ,
 
 421 F.3d 1133
 
 , 1137, 1141 (C.A.10 2005) (2.5 miles of tunnel separated the "point source" and "navigable waters").
 

 Id.
 
 at 743,
 
 126 S.Ct. 2208
 
 (plurality opinion) (emphasis in original). True, Justice Scalia's plurality opinion is not binding. But no Justice challenged this aspect of the opinion, and for good reason: the statutory text unambiguously supports it.
 

 Further, applying the CWA to point-source pollution traveling briefly through groundwater before reaching a navigable water promotes the CWA's primary purpose, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
 
 33 U.S.C. § 1251
 
 (a). By contrast, the majority's approach defeats the CWA's purpose by opening a gaping regulatory loophole: polluters can avoid CWA liability by discharging their pollutants into groundwater, even if that groundwater flows immediately into a nearby navigable water. This exception has no textual or logical foundation. As one district court observed,
 

 it would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants
 into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.
 

 See
 

 N. Cal. River Watch v. Mercer Fraser Co.
 
 , No. C-04-
 
 4620 SC, 2005
 
 WL 2122052, at *2 (N.D. Cal. Sept. 1, 2005). In addition, this exception has no apparent limits. Based on the majority's logic, polluters are free to add pollutants to navigable waters so long as the pollutants travel through any kind of intermediate medium-for example through groundwater, across fields, or through the air. This would seem to give polluters free rein to discharge pollutants from a sprinkler system suspended above Lake Michigan. After all, pollutants launched from such a sprinkler system would travel "in all directions, guided only by the general pull of gravity."
 
 See
 
 Maj. Op. at 933. According to the majority, this would defeat CWA liability.
 
 [2]
 

 I have a very different view. In cases where, as here, a plaintiff alleges that a defendant is polluting navigable waters through a complex pathway, the court should require the plaintiff to prove the
 existence of pollutants in the navigable waters and to persuade the factfinder that the defendant's point source is to blame-that the defendant is unlawfully "add[ing] ... any pollutant to navigable waters from any point source."
 
 33 U.S.C. § 1362
 
 (12)(A). The more complex the pathway, the more difficult the proof. Where these cases are plausibly pleaded, they should be decided on the facts.
 

 Instead, the majority holds that a plaintiff may never-as a matter of law-prove that a defendant has unlawfully added pollutants to navigable waterways via groundwater. For its textual argument, the majority refers us to the term "effluent limitations." This term, the majority says, is defined as "restrictions on the amount of pollutants that may be 'discharged from point sources
 
 into
 
 navigable waters.' " Maj. Op. at 934 (quoting with emphasis
 
 3 U.S.C. § 1362
 
 (11) ). Seizing on the word "into"-which denotes "entry, introduction, insertion"-the majority concludes that the effluent-limitation definition implicitly creates an element of "directness." In other words, the majority reasons, "for a point source to discharge
 
 into
 
 navigable waters, it must dump
 
 directly
 
 into those navigable waters[.]"
 

 Id.
 

 (emphasis in original).
 

 The majority is way off the rails. First of all, "Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions-it does not, one might say, hide elephants in mouseholes.' "
 
 Epic Sys. Corp. v. Lewis
 
 , --- U.S. ----,
 
 138 S. Ct. 1612
 
 , 1626-27,
 
 200 L.Ed.2d 889
 
 (2018) (quoting
 
 Whitman v. Am. Trucking Assns., Inc.
 
 ,
 
 531 U.S. 457
 
 , 468,
 
 121 S.Ct. 903
 
 ,
 
 149 L.Ed.2d 1
 
 (2001) ). The majority should heed this commonsense advice. Congress did not hide a massive regulatory loophole in its use of the word "into."
 

 But more importantly, the majority's quoted definition of "effluent limitation" from § 1362(11) -the supposed origin of the loophole-is not relevant to this case. The citizen-suit provision uses the term "effluent standard or limitation"-not the term "effluent limitation."
 
 See
 

 33 U.S.C. § 1365
 
 (f). As the majority itself argues, minor distinctions in statutory language sometimes matter. This one does. The phrase "effluent standard or limitation" is a term of art and is wholly distinct from the term "effluent limitation." This conclusion is supported not by tea leaves or a carefully selected dictionary, but rather by the CWA itself. The citizen-suit provision of the CWA provides that "effluent standard or limitation" means, among other things, "an unlawful act under subsection (a) of section 1311 of this title."
 
 33 U.S.C. § 1365
 
 (a). Turning to § 1311(a), we find that, absent certain exceptions, "the discharge of any pollutant by any person shall be unlawful," § 1311(a), and the "discharge of a pollutant" means "any addition of any pollutant
 
 to
 
 navigable waters from any point source," § 1362(12)(A) (emphasis added). Thus, even assuming the majority correctly parses the definition of "into"-a dubious proposition at best-the word "into" is not contained in any of the statutory provisions at issue. Rather, we find the word "to," which does not even arguably suggest a requirement of directness; the word "to" merely "indicate[s] movement or an action or condition suggestive of movement toward a place, person, or thing reached."
 
 To
 
 , Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/to.
 

 It is therefore entirely unclear why the majority relies on the definition of "effluent limitation." That definition is simply irrelevant to this lawsuit. As a result, the majority's criticisms of the approach taken by the Fourth and Ninth Circuits miss the mark. Indeed, the Fourth Circuit analyzed
 the correct statutory text when it rejected the argument that the citizen-suit provision requires directness:
 

 [t]he plain language of the CWA requires only that a discharge come "from" a "point source."
 
 See
 

 33 U.S.C. § 1362
 
 (12)(A). Just as the CWA's definition of a discharge of a pollutant does not require a discharge directly to navigable waters,
 
 Rapanos
 
 ,
 
 547 U.S. at 743
 
 ,
 
 126 S.Ct. 2208
 
 , neither does the Act require a discharge directly from a point source,
 
 see
 

 33 U.S.C. § 1362
 
 (12)(A). The word "from" indicates "a starting point: as (1) a point or place where an actual physical movement ...
 
 has its beginning
 
 ." Webster's Third New International Dictionary 913 (Philip Babcock Gove et al. eds., 2002) (emphasis added);
 
 see also
 
 The American Heritage Dictionary of the English Language 729 (3d ed. 1992) (noting "from" indicates a "starting point" or "cause"). Under this plain meaning, a point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters.
 

 Upstate Forever
 
 ,
 
 887 F.3d at 650
 
 (footnote omitted). In short, if the majority would like to add a "directness" requirement to § 1311, it must fight the statutory text to get there.
 

 In addition, the majority fails to meaningfully distinguish Justice Scalia's concurrence in
 
 Rapanos
 
 , which made clear that the CWA applies to indirect pollution. It is true that
 
 Rapanos
 
 dealt with different facts. But it is irrelevant that the pollution in
 
 Rapanos
 
 traveled through point sources before reaching a navigable water, whereas the pollution in this case allegedly traveled through groundwater, which, according to the majority, is not a point source. In both cases, the legal issue is the same: whether the CWA applies to pollution that travels from a point source to navigable waters through a complex pathway.
 
 See
 

 Rapanos
 
 ,
 
 547 U.S. at 745
 
 ,
 
 126 S.Ct. 2208
 
 (asking whether "the contaminant-laden waters ultimately reach covered waters"). Indeed, Justice Scalia favorably cited the Second Circuit's discussion in
 
 Concerned Area Residents for the Environment
 
 .
 
 Rapanos
 
 ,
 
 547 U.S. at 744
 
 ,
 
 126 S.Ct. 2208
 
 . In that case, pollutants traveled across fields-which "were not necessarily point sources themselves"-before reaching navigable waters.
 
 Hawai'i Wildlife Fund
 
 ,
 
 886 F.3d at 748
 
 . Given the Supreme Court plurality's endorsement of the Second Circuit's approach, the majority's attempt to distinguish
 
 Rapanos
 
 collapses.
 

 Next, the majority warns that imposing liability would upset the cooperative federalism embodied by the CWA. On this view, the states alone are responsible for regulating pollution of groundwater, even if that pollution later travels to a navigable water. Wrong again. To be sure, the CWA recognizes the "primary responsibilities and rights of States" to regulate groundwater pollution.
 
 33 U.S.C. § 1251
 
 (b). But imposing liability in this case would not marginalize the states. To the contrary, the district court in today's companion case made clear that disputes like this one do
 
 not
 
 involve regulating groundwater.
 
 See
 

 Tennessee Clean Water Network
 
 , 273 F.Supp.3d at 826 ("The Court agrees with those courts that view the issue not as whether the CWA regulates the discharge of pollutants into groundwater itself but rather whether the CWA regulates the discharge of pollutants to navigable waters via groundwater." (quotation marks, alteration, and citation omitted) ). Instead, the district court explained that the issue is the regulation of navigable water
 
 via
 
 groundwater.
 
 Id.
 
 This distinction was also clear to the Fourth and Ninth Circuits.
 
 See
 

 Upstate Forever
 
 ,
 
 887 F.3d at 652
 
 ("We do not hold that the CWA covers discharges
 to ground water itself. Instead, we hold only that an alleged discharge of pollutants, reaching navigable waters ... by means of ground water with a direct hydrological connection to such navigable waters, falls within the scope of the CWA.");
 
 Hawai'i Wildlife Fund
 
 ,
 
 886 F.3d at 749
 
 ("[T]he County's concessions conclusively establish that pollutants discharged from all four wells emerged at discrete points in the Pacific Ocean.... We leave for another day the task of determining when, if ever, the connection between a point source and a navigable water is too tenuous to support liability under the CWA."). Accordingly, if Plaintiffs successfully prove the allegations in their complaint, imposing liability in this case would fit perfectly with the CWA's stated purpose: to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
 
 33 U.S.C. § 1251
 
 (a).
 

 Finally, the majority offers a narrow reading of the CWA because, in its view, a more inclusive reading would render "virtually useless" the Coal Combustion Residuals ("CCR") Rule under RCRA. Maj. Op. at 938. The majority notes that if a polluter's conduct is regulated through a CWA permit, then RCRA does not also apply. The majority therefore suggests that a straightforward reading of the CWA is incompatible with RCRA. The majority would gut the former statute to save the latter.
 

 But the EPA has already dismissed the majority's concern. Indeed, the EPA issued federal regulations on this issue many decades ago. The EPA's interpretation is that the industrial discharge of waste such as CCR is subject to regulation under both RCRA and the CWA: RCRA regulates the way polluters store CCR, and the CWA kicks in the moment CCR enters a navigable waterway.
 
 See
 

 40 C.F.R. § 261.4
 
 (a)(2). The EPA first articulated this approach in a set of regulations from 1980, which provide that "[i]ndustrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act" "are not solid wastes for the purpose of" the RCRA exclusion.
 
 40 C.F.R. § 261.4
 
 (a)(2). This exclusion, the regulation explains, "applies only to the
 
 actual point source discharge
 
 . It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment." § 261.4(a)(2) (comment) (emphasis added). Thus, under the EPA's reading, a polluter can be liable under RCRA for improperly storing CCR-even if the CCR never enters a navigable waterway.
 
 See
 

 id.
 

 Conversely, a polluter can be liable under the CWA for adding CCR to a navigable waterway-even if the polluter's storage methods comport with RCRA.
 
 See
 

 id.
 

 And of course, a polluter can be liable under both statutes if the polluter both improperly stores CCR and discharges it to a navigable waterway.
 
 See
 

 id.
 

 The EPA settled any doubts on this matter by publishing a detailed description of its rationale in the Federal Register.
 
 See
 

 45 Fed. Reg. 33098
 
 . The EPA explained that
 
 40 C.F.R. § 261.4
 
 (a)(2) reflects the EPA's interpretation that regulation of a polluter's discharge of industrial waste to a navigable waterway pursuant to the CWA does
 
 not
 
 trigger the
 
 42 U.S.C. § 6903
 
 (27) exclusion and therefore does
 
 not
 
 exempt that polluter's storage of CCR from regulation under RCRA:
 

 The obvious purpose of the industrial point source discharge exclusion in Section 1004(27) was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act. Without such a provision, the discharge of wastewater into navigable waters
 would be "disposal" of solid waste, and potentially subject to regulation under both the Clean Water Act and Subtitle C [of RCRA]. These considerations do not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and holding facilities-primarily groundwater contamination-cannot be controlled under the Clean Water Act or other EPA statutes.
 

 Had Congress intended to exempt industrial wastewaters in storage and treatment facilities from all RCRA requirements, it seems unlikely that the House Report on RCRA would have cited, as justification for the development of a national hazardous waste management program, numerous damage incidents which appear to have involved leakage or overflow from industrial wastewater impoundments.
 
 See, e.g.
 
 , H.R. Rep. at 21. Nor would Congress have used the term "discharge" in Section 1004(27). This is a term of art under the Clean Water Act (Section 504(12) ) and refers only to the "addition of any pollutant to navigable waters", not to industrial wastewaters prior to and during treatment.
 

 Since the comment period closed on EPA's regulations, both Houses of Congress have passed amendments to RCRA which are designed to provide EPA with more flexibility under Subtitle C in setting standards for and issuing permits to existing facilities which treat or store hazardous wastewater.
 
 See
 
 Section 3(a)(2) of H.R. 3994 and Section 7 of S.1156.
 
 See
 

 also
 
 S. Rep. No. 96-173, 96th Cong., 1st Sess. 3 (1979); Cong. Rec. S6819, June 4, 1979 (daily ed.); Cong. Rec. H1094-1096, February 20, 1980 (daily ed.). These proposed amendments and the accompanying legislative history should lay to rest any question of whether Congress intended industrial wastewaters in holding or treatment facilities to be regulated as "solid waste" under RCRA.
 

 45 Fed. Reg. 33098
 
 . Congress ratified the EPA's interpretation when it enacted amendments to RCRA, which the EPA said would "lay to rest" any concerns about whether industrial wastes like CCR are subject to regulation under both RCRA (in terms of their storage and treatment) and the CWA (in terms of their discharge to navigable waters).
 

 Id.
 

 ;
 
 see
 
 Public Law 96-482. From this history, and from the text of the statutes, we can surmise that Congress intended to delegate to the EPA the power "to speak with the force of law" on this aspect of the interplay between RCRA and the CWA.
 
 See
 

 United States v. Mead Corp.
 
 ,
 
 533 U.S. 218
 
 , 229,
 
 121 S.Ct. 2164
 
 ,
 
 150 L.Ed.2d 292
 
 (2001). Exercising this authority, the EPA reached an interpretation that is different from-and incompatible with-that of the majority.
 

 Contravening bedrock principles of administrative law, the majority bulldozes the EPA's interpretation of its own statutory authority without even discussing the possibility of deference. But "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."
 
 Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.
 
 ,
 
 467 U.S. 837
 
 , 844,
 
 104 S.Ct. 2778
 
 ,
 
 81 L.Ed.2d 694
 
 (1984).
 

 In
 
 Chevron
 
 , this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts.
 

 467 U.S. at 865-866
 
 ,
 
 104 S.Ct. 2778
 
 . If a statute is ambiguous, and if the implementing agency's construction is reasonable,
 
 Chevron
 
 requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.
 

 Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.
 
 ,
 
 545 U.S. 967
 
 , 980,
 
 125 S.Ct. 2688
 
 ,
 
 162 L.Ed.2d 820
 
 (2005). The EPA says that imposing CWA liability for the discharge of CCR to navigable waterways does not eliminate the possibility of RCRA liability for the storage and treatment of CCR. The majority suggests the exact opposite. Unfortunately for the majority, but fortunately for those who enjoy clean water, the majority lacks the authority to override longstanding EPA regulations on a whim.
 
 See
 

 id.
 

 For all these reasons, I believe the CWA clearly applies to the allegations in this case. Accordingly, I would join our sister circuits in holding that the CWA prohibits all pollution that reaches navigable waters "by means of ground water with a direct hydrological connection to such navigable waters[.]"
 
 Upstate Forever
 
 ,
 
 887 F.3d at
 
 652 ;
 
 see
 

 Hawai'i Wildlife Fund
 
 ,
 
 886 F.3d at 745-49
 
 . Under this standard, Plaintiffs have stated a valid claim that Kentucky Utility Company's unpermitted leaks are unlawful. Because the majority holds otherwise, I respectfully dissent in part. I agree with the majority's opinion only insofar as the majority finds that the district court erred by dismissing Plaintiffs' RCRA claim.
 

 The other case is Case No. 17-6155,
 
 Tennessee Clean Water Network v. Tennessee Valley Authority
 
 .
 

 The majority declines to reverse the district court's other finding that a coal ash pond is a point source under the CWA, but suggests disagreement in a footnote. The CWA defines "point source" as "any discernible, confined and discrete conveyance," including "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."
 
 33 U.S.C. § 1362
 
 (14). The majority cites a recent Fourth Circuit case,
 
 Sierra Club v. Va. Elec. & Power Co.
 
 , No. 17-1952,
 
 903 F.3d 403
 
 ,
 
 2018 WL 4343513
 
 (4th Cir. Sept. 12, 2018), which held that a coal ash pond is not a point source because it was a "static recipient[ ] of the precipitation and groundwater that flowed through [it]."
 
 2018 WL 4343513
 
 at *6. Looking at the text of the CWA, however, shows that,
 
 inter alia
 
 , "ditch[es], well[s], container[s]," and "vessel[s]" are included in the definition.
 
 33 U.S.C. § 1362
 
 (14). The canon of
 
 ejusdem generis
 
 states that "the general term must take its meaning from the specific terms with which it appears."
 
 Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh
 
 ,
 
 691 F.3d 821
 
 , 833 (6th Cir. 2012). The common denominator between wells, containers, ditches, and vessels is that each is a man-made, defined area where liquid collects. The canon of
 
 ejusdem generis
 
 thus suggests that man-made coal ash ponds are included in this definition. The Fourth Circuit instead cites a dictionary definition of "conveyance" as "a facility-for the movement of something from one place to another" without explaining how items like wells, containers, and vessels fit this definition.
 
 Va. Elec. & Power Co.
 
 ,
 
 2018 WL 4343513
 
 , at *5 (quoting
 
 Webster's Third New International Dictionary
 
 499 (1961) ). The Fourth Circuit suggests that a container can be a point source only if it is in the act of conveying something,
 
 2018 WL 4343513
 
 , at *7, ignoring that the statutory definition includes "
 
 any
 
 ... container ... from which pollutants are or may be discharged."
 
 33 U.S.C. § 1362
 
 (14) (emphasis added).
 

 The Fourth Circuit's approach is further misguided in that it conflicts with the broad interpretation that federal courts have traditionally given to the phrase "point source."
 
 See, e.g.
 
 ,
 
 Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.
 
 ,
 
 575 F.3d 199
 
 , 219 (2d Cir. 2009) (quoting
 
 Dague v. City of Burlington,
 

 935 F.2d 1343
 
 , 1354-55 (2d Cir. 1991),
 
 rev'd on other grounds
 
 ,
 
 505 U.S. 557
 
 ,
 
 112 S.Ct. 2638
 
 ,
 
 120 L.Ed.2d 449
 
 (1992) ) ("[T]he definition of a point source is to be broadly interpreted.");
 
 Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy
 
 ,
 
 305 F.3d 943
 
 , 955 (9th Cir. 2002) (quoting
 
 Dague,
 

 935 F.2d at
 
 1354-55 );
 
 Cmty. Ass'n for Restoration of Env't (CARE) v. Sid Koopman Dairy
 
 ,
 
 54 F. Supp. 2d 976
 
 , 980 (E.D. Wash. 1999) (citing
 
 Dague,
 

 935 F.2d at
 
 1354-55 );
 
 Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC
 
 ,
 
 141 F. Supp. 3d 428
 
 , 444 (M.D. N.C. 2015) (quoting
 
 Dague,
 

 935 F.2d at
 
 1354-55 );
 
 see
 

 United States v. Earth Scis., Inc.
 
 ,
 
 599 F.2d 368
 
 , 373 (10th Cir. 1979) ("[T]he concept of a point source was designed to further [the CWA's regulatory] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States."). By embracing a restrictive definition of what constitutes a point source, the Fourth Circuit jettisons these long-standing principles.