**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; GRAND CANYON WILDLANDS COUNCIL, *Plaintiffs-Appellants*, | No. 17-15790 |
| | D.C. No. 3:12-cv-08176-SMM |
| v. | |
| UNITED STATES FOREST SERVICE, a United States Government Agency, *Defendant-Appellee*, | OPINION |
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.; SAFARI CLUB INTERNATIONAL; NATIONAL SHOOTING SPORTS FOUNDATION, INC., *Intervenor-Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted September 7, 2018
San Francisco, California

Filed May 30, 2019

Before:  Marsha S. Berzon and Michelle T. Friedland, Circuit Judges, and Kathleen Cardone,[*] District Judge.

Opinion by Judge Berzon

## SUMMARY[**]

### Resource Conservation and Recovery Act

The panel reversed the district court's dismissal for lack of jurisdiction and remanded in an action brought under the citizen suit provision of the Resource Conservation and Recovery Act seeking to require the United States Forest Service to address the use of lead ammunition by hunters in Arizona's Kaibab National Forest.

Plaintiffs alleged that the California condor and other scavenger wildlife species living in the Kaibab National Forest ingest lead ammunition left in animal carcasses by hunters.  The scavengers then suffer lead poisoning. Plaintiffs sought a declaratory judgment that the Forest Service had violated the Resource Conservation and Recovery Act, as well as a permanent injunction preventing the Forest Service from "creating or contributing to the creation of an imminent and substantial endangerment to human health or the environment" in the Kaibab.  The district court dismissed the lawsuit for lack of jurisdiction on

---

[*] The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the basis that plaintiffs were requesting an advisory opinion. The court also ruled that any order requiring the Forest Service to prohibit lead ammunition would be an improper intrusion into the Service's domain.

The panel held that plaintiffs' suit satisfied the two requirements that distinguish justiciable controversies from requests for advisory opinions. First, the panel determined there was no doubt that the case concerned a genuine adversary issue between the parties. Second, the panel held that a ruling in plaintiffs' favor would require the Service to mitigate in *some* manner—not necessarily by banning use of lead ammunition in the Kaibab—the harm caused by spent lead ammunition, thereby leading to a change in the Forest Service's operation of the Kaibab.

The panel rejected the Forest Service's contention that the district court had discretion to decline jurisdiction over the case because plaintiffs were seeking equitable relief. The panel held that the district court's order dismissing the case was based squarely on its determination that it lacked jurisdiction, not on any exercise of discretion to decline jurisdiction. The panel next noted that the Forest Service had failed to establish that this case falls within any of the categories outlined in *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996), where abstention is warranted. The panel further rejected the contention that the district court had discretion to decline jurisdiction under the Declaratory Judgment Act's permissive language. The panel noted that the suit was brought as a citizen suit under the Resource Conservation and Recovery Act, and nothing in the Act's private civil action provision conferred judicial discretion to decline to entertain such a suit.

The panel held that because the district court dismissed for lack of jurisdiction, it never had the chance to consider the questions of first impression pertaining to contributor liability under the Resource Conservation and Recovery Act in the factual context presented by this case. Given the circumstances, the panel thought it wise to permit further proceedings at the district court rather than reach the merits, both so the parties could present the issues as they had evolved more fully and so that plaintiffs had the opportunity to seek to amend the Complaint so as to more fully spell out the bases for the Forest Service's contributor liability.

## COUNSEL

Allison LaPlante (argued), Lia Comerford, and Kevin Cassidy, Earthrise Law Center, Lewis & Clark Law School, Portland, Oregon, for Plaintiffs-Appellants.

Allen M. Brabender (argued), Dustin J. Maghamfar, and John Smeltzer, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Gary Fremerman, Office of the General Counsel, United States Department of Agriculture, Washington, D.C.; for Defendant-Appellee.

Norman D. James (argued), and Ronald W. Opsahl, Fennemore Craig P.C., Phoenix, Arizona, for Intervenor-Defendant-Appellee National Shooting Sports Foundation.

Scott M. Franklin and C.D. Michel, Michel & Associates PC, Long Beach, California; Michael T. Jean, Fairfax,

Virginia; for Intervenor-Defendant-Appellee National Rifle Association of America.

Anna M. Seidman, Washington, D.C., for Intervenor-Defendant-Appellee Safari Club International.

## OPINION

BERZON, Circuit Judge:

The California condor and other scavenger wildlife species living in Arizona's Kaibab National Forest ("the Kaibab") ingest lead ammunition left in animal carcasses by hunters.  The scavengers then suffer lead poisoning. Plaintiffs-Appellants Center for Biological Diversity, Sierra Club, and Grand Canyon Wildlands Council (collectively, "the Center") seek an injunction under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, to require the Kaibab's administrator, the United States Forest Service ("USFS"), to address hunters' use of lead ammunition in the Kaibab. The Center alleges that USFS is liable for "contributing to the past or present . . . disposal" of a solid waste, 42 U.S.C. § 6972(a)(1)(B), and it requests declaratory and injunctive relief to require USFS to "abate the endangerment" from lead ammunition in the Kaibab.

The last time this case was before this court, we reversed the district court's earlier dismissal for lack of standing. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 640 F. App'x 617, 620 (9th Cir. 2016).  When the case returned to the district court, USFS filed a motion to dismiss for failure to state a claim.  USFS maintains that it is not subject to suit in this case because RCRA only governs parties that actively

contribute to the disposal of solid waste. Two groups of intervenors ("Intervenors") filed separate motions presenting additional arguments as to why USFS cannot be sued under the statute with respect to the use of lead ammunition in the Kaibab. Rather than addressing these arguments, the district court held that the Center was requesting an improper advisory opinion and dismissed the lawsuit on justiciability grounds. The Center appealed.

## I.

## A.

The Kaibab is both home to a variety of wildlife species, including several species of avian predators, and a favorite site for big-game hunting. Some hunters in the Kaibab use lead ammunition, and some of them leave behind the remains of their kill, either because they prefer not to "pack out" the remains or because the hunted animal runs away after it is shot and then dies elsewhere. Other animals feed on those remains and ingest fragments of spent lead ammunition. Lead ingestion, even in small amounts, can cause significant adverse effects on animals' health, including death. Because of such health consequences, the federal government has banned the use of lead bullets for waterfowl hunting nationwide since 1991. 50 C.F.R. § 20.108; *see also* Migratory Bird Hunting: Nationwide Requirement to Use Nontoxic Shot for the Taking of Waterfowl, Coots, and Certain Other Species Beginning in the 1991–92 Hunting Season, 56 Fed. Reg. 22,100, 22,100–01 (May 13, 1991).

The Center alleges that, in particular, lead ammunition has a significant impact on the endangered California condor, only 73 of which lived in the Southwest at the time of filing. Because condors rely on animal carcasses as a

primary food source, the Complaint alleges, "[l]ead poisoning has been and continues to be the leading cause of condor mortality in Arizona," and "[s]pent lead ammunition has been and continues to be the primary source of the condors' lead exposure in Arizona."

Despite its authority to do so, [1] USFS does not regulate hunting in the Kaibab outside certain narrow restrictions, and does not regulate the use of lead ammunition in the Kaibab at all. Nor does the agency require a permit for hunting in the Kaibab. *See* 36 C.F.R. § 251.50(c) ("A special use authorization is not required for noncommercial recreational activities, such as . . . hunting . . . ."). USFS does require that any commercial entities operating in the Kaibab, including hunting outfitters, obtain "special use" permits, but those permits do not regulate the hunting itself. Instead, USFS defers to Arizona's hunting regulations,

---

[1] "[T]he Forest Service has the authority to control certain conduct of the third-party hunters." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 640 F. App'x 617, 619 (9th Cir. 2016); *see also* 36 C.F.R. §§ 261.50(a); 261.70(a)(4). At oral argument during the Center's earlier appeal, USFS recognized that it could remove the lead bullets left on Forest Service land, require hunters to do so, or prohibit the use of lead bullets. Oral Argument at 18:18, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 640 Fed. App'x 617 (9th Cir. 2016) (No. 13-16684), http://www.ca9.uscourts.gov/media/view_video.php? pk_vid=0000008 616. Congress has, however, repeatedly prohibited federal agencies from spending funds "to regulate the lead content of ammunition." *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 418, 133 Stat. 13, 262 (2019); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 418, 132 Stat. 348, 691 (2018); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 420, 131 Stat. 135, 498–99 (2017); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 420, 129 Stat. 2242, 2579 (2016); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 425, 128 Stat. 2130, 2450 (2015).

which govern National Forest System lands in Arizona. *See* Ariz. Rev. Stat. § 17-234.

Arizona allows hunters to use lead ammunition except when hunting waterfowl. *See generally* Ariz. Admin. Code § R12-4-304. Arizona has taken steps to reduce the impact of spent lead ammunition on the condor and other species. Among other efforts, the state runs a "voluntary lead reduction program" that encourages hunters to use non-lead ammunition and provides hunters with non-lead ammunition free of cost during the big-game hunting season. The Center alleges that lead poisoning is nevertheless still a significant problem in the Kaibab.

## B.

RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). The statute aims "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)).

The Environmental Protection Agency ("EPA") has "[c]hief responsibility" for implementing RCRA. *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 506 (9th Cir. 2013). To promote robust enforcement, RCRA includes a citizen suit provision, section 7002, that allows "any person" to "commence a civil action on his own behalf." Resource Conservation and Recovery Act of 1976, Pub. L. No. 94-580, § 7002, 90 Stat. 2795, 2825 (1976) (codified at 42 U.S.C. § 6972(a)). One prong of section

7002, as amended in 1984, creates a private right of action against:

> any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

Hazardous and Solid Waste Amendments of 1984, Pub. L. 98-616, § 401, 98 Stat. 3221, 3269 (codified at 42 U.S.C. § 6972(a)(1)(B)).   When a case is brought under this provision, the district court "shall have jurisdiction . . . to restrain any person" who has violated the statute, "to order such person to take such other action as may be necessary, or both."  42 U.S.C. § 6972(a).

## C.

In 2012, the Center filed suit under RCRA, alleging that USFS's failure to regulate in any way the use of lead ammunition created "an imminent and substantial endangerment to health or the environment."  The Center contends that USFS is responsible for curbing or remedying hunters' disposal of spent lead ammunition on two grounds: (1) "failing to use its broad authority [pursuant to both its landowner status and regulatory authority] to stop the disposal of . . . spent ammunition," and (2) "issuing Special

Use permits for guiding and outfitting activities that do not prohibit the use of lead ammunition." The Center sought a declaratory judgment that USFS had violated RCRA, as well as a permanent injunction preventing USFS from "creating or contributing to the creation of an imminent and substantial endangerment to human health or the environment" in the Kaibab.

USFS moved to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for failure to state a claim under Rule 12(b)(6). The district court dismissed on standing grounds. The court determined that although the Center had demonstrated an injury that was fairly traceable to USFS's conduct, it had not shown that a judgment in its favor was likely to redress that injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Construing the Center's requested relief as requiring USFS to engage in rule making under the Administrative Procedure Act ("APA"), the court reasoned that it was "not empowered" to order the agency do so under *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). *Norton* held that a suit brought under the APA to "compel agency action unlawfully withheld . . . can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 63–64. Even if it had not been constrained by *Norton*, the court further concluded, it was "speculative at best" whether the any rule making that it ordered USFS to conduct would produce a final rule that would better protect the at-risk species and thereby redress the Center's alleged injury.

We reversed in a memorandum disposition. USFS conceded at argument in that appeal that *Norton* did not apply because the Center's suit was brought under RCRA, not under the APA. *Ctr. for Biological Diversity*, 640 F.

App'x at 619.   With *Norton* posing no bar to relief, we concluded that the relief the Center sought was "likely to redress at least partially the alleged injuries."  *Id.*  USFS had not argued on appeal that the Center had failed to state a claim under RCRA.  We "left [it] to the district court" to assess in the first instance whether it was appropriate to dismiss the Center's claim under Rule 12(b)(6).  *Id.* at 620.

On remand, the district court did not address the question we remanded for determination—whether the Center had stated a viable claim against USFS.  Instead, the court dismissed for lack of jurisdiction on the basis that the Center was requesting an advisory opinion.  The court stated that the case did not present an "actual, justiciable controversy," because any judicial directive would be "nothing more than a recommendation to the USFS," not "conclusive" or "binding" on the agency.  The court also reasoned that any order requiring USFS to prohibit lead ammunition "would be an improper intrusion into the domain of the USFS."  On these grounds, the court granted USFS's motion to dismiss.

## II.

### A.

The rule against advisory opinions is "the oldest and most consistent thread in the federal law of justiciability," reflecting the same core considerations that underlie the justiciability doctrine more generally.  *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (quoting Charles Alan Wright, *Federal Courts* 34 (1963)).   The advisory opinion prohibition ensures that "[f]ederal judicial power is limited to those disputes which confine federal courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process."  *Id.* at 97.

In line with these considerations, to present a justiciable dispute rather than a request for an advisory opinion a case must satisfy two requirements:  First, the case must present "an honest and actual antagonistic assertion of rights by one [party] against another."  *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (alteration in original) (quoting *Muskrat v. United States*, 219 U.S. 346, 359 (1911)); *see also Flast*, 392 U.S. at 95.  Second, the court must be empowered to issue a decision that serves as more than an advisement or recommendation.  *U.S. Nat'l Bank*, 508 U.S. at 446.  A party does not seek an advisory opinion where "valuable legal rights . . . [would] be directly affected to a specific and substantial degree" by a decision from the court.  *Id.* (alterations in original) (quoting *Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 262 (1933)).

The Center's suit satisfies the two requirements that distinguish justiciable controversies from requests for advisory opinions.  First, there is no doubt this case concerns a "genuine adversary issue between the parties."  *United States v. Johnson*, 319 U.S. 302, 304 (1943) (per curiam).  We so determined when we concluded in our earlier disposition that the Center had satisfied the injury and causation requirements for standing:

> The Center established injury in fact through declarations of intent to continue visiting the Kaibab National Forest and the allegations that the Forest Service's tacit permission for hunters to use lead ammunition endangers wildlife. The complaint also sufficiently established causation by drawing a connection between the Forest Service's refusal to exercise its authority to regulate the use of lead, the continuing use of lead

> ammunition by hunters, and the poisoning of condors and other wildlife that scavenge remains contaminated by the lead.

*Ctr. for Biological Diversity*, 640 F. App'x at 619. Moreover, the parties did not collude to bring this case to court; this case is not one "conducted under the domination of only one" party, *Johnson*, 319 U.S. at 305.

Second, a ruling in the Center's favor would require USFS to mitigate in *some* manner—not necessarily by banning use of lead ammunition in the Kaibab—the harm caused by spent lead ammunition, thereby leading to a change in USFS's operation of the Kaibab. Again, we have already determined that the relief the Center seeks "is likely to redress at least partially the alleged injuries." *Ctr. for Biological Diversity*, 640 F. App'x at 619.

Largely ignoring our previous disposition, the district court provided three overlapping justifications for its decision. All three rest on a misperception of the effect of a ruling in favor of the Center.

First, the court concluded that an order requiring USFS to "abate the endangerment" from lead ammunition would "amount to nothing more than a recommendation to the USFS that the USFS would be free to disregard." This conclusion rests on the assumption that USFS would maintain discretion over whether to regulate lead ammunition no matter what a judicial order directed it to do.

RCRA specifically provides otherwise. It specifies that "the district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to [a substantial endangerment to health or the environment], to order such person to take such other action as may be

necessary, or both." 42 U.S.C. § 6972(a). And it defines "person" to include "the United States and any other governmental instrumentality or agency." *Id.* § 6972(a)(1)(A). As the Supreme Court has explained, the meaning of these provisions is evident:

> Under a plain reading of [RCRA's] remedial scheme, a private citizen . . . could seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA.

*Meghrig*, 516 U.S. at 484. And it is incontrovertible that "a person subject to an injunction must ordinarily obey it." *Irwin v. Mascott*, 370 F.3d 924, 931 (9th Cir. 2004) (citing *Walker v. City of Birmingham*, 388 U.S. 307 (1967)). So, whatever discretion USFS otherwise has regarding regulating—or not regulating—hunting in the Kaibab, the agency would have to comply with an order from the court regarding the disposal of lead bullets in the Kaibab.

Second, the district court reasoned that the Center was asking for an order "with no clear terms for attainment," and that any such order "would necessarily be subject to later review, input, or alteration by other entities." For this critique the district court principally relied on *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948). *Waterman* has no relevance to this case.

*Waterman* involved sections of the Civil Aeronautics Act of 1938, 49 U.S.C. §§ 601, 646, that provided for both presidential and judicial review of an administrative order granting an application for an overseas air route. *Waterman*,

333 U.S. at 104–05. The Supreme Court held this dual review system unconstitutional regardless of the order in which each stage of review took place. *Id.* at 114. If the President approved the order first, then that order would "embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate." *Id.* If a court reviewed the order first, then its decision—still subject to presidential approval—would be "an advisory opinion in its most obnoxious form." *Id.* at 113.

This case could not be less similar to *Waterman*. *Waterman* was fundamentally about separation of powers within the federal government concerning a matter as to which the President had unreviewable discretion. Here, the agency—USFS—has no such unreviewable discretion. Section 7002 expressly grants the judiciary authority

> to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in [§ 6972](a)(1)(B), to order such person to take such other action as may be necessary, or both . . . .

42 U.S.C.A. § 6972(a). USFS might have some discretion over how to implement an order from the court, but not over whether to follow it.

The district court also cited in support of its "no clear terms for attainment" holding a series of statutes and regulations directing USFS to cooperate with other federal and state entities in the exercise of its duties. None of those statutes allow USFS to disregard a judicial directive specifically authorized by RCRA if the requisite liability findings are made.

Third, the district court maintained that an order to "'abate the endangerment' . . . would be an improper intrusion into the domain of the USFS." Because regulation of lead ammunition "is a matter on which the USFS has knowledge and expertise," the court reasoned, it was "not authorized" to direct USFS as to that matter.

That justification would preclude courts from issuing injunctions against expert administrative agencies, which, of course, we regularly do. We have done so against the USFS with regard to such matters within its "knowledge and expertise" such as riparian reserves, *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2007), and hiking access on public lands, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 649 (9th Cir. 2004).

At bottom, the district court's holding, albeit purportedly grounded in separation of powers principles, is irreconcilable with the system those principles exist to serve. *See N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982). In RCRA, Congress expressly authorized private suits such as this one and set forth specific conditions for the exercise of judicial authority in such suits. To the extent the exercise of that authority "intrudes"—to use the district court's term—on the exercise of USFS's discretion, it does so because that discretion is subject to the limits enunciated by Congress, and because Congress has sanctioned judicial "intrusion" if those limits are exceeded. Typically, we call that "intrusion" judicial review.

### B.

USFS does not defend the district court's holding that the Center is seeking an advisory opinion. Instead, USFS recasts the district court's ruling and then defends its version of what the court meant: USFS maintains first that "[t]he

district court's decision is better construed as declining jurisdiction based on equitable factors, including deference to the policy choices of the other branches of the federal government." USFS then goes on to argue that the district court had discretion to decline jurisdiction over the case because the Center is seeking equitable relief. There are two fatal flaws in this position.

**1.**

The district court's opinion cannot plausibly be read as anything other than a dismissal for lack of jurisdiction. Although the court stated in its order that a federal court has discretion over whether to issue a declaratory judgment under the Declaratory Judgment Act, it did not suggest that it had similar discretion to decline to exercise jurisdiction over a request for the injunctive relief expressly authorized by Congress in RCRA.

The district court declared at the outset that "a federal court first must be satisfied that the lawsuit passes *constitutional muster* and fulfills statutory jurisdictional prerequisites before it exercises its [declaratory judgment] discretion" (emphasis in original). The court then explained that because "there [was] no real and substantial controversy" before it, "the relief requested by Plaintiffs would necessarily take the form of an advisory opinion." The court's subsequent analysis rested entirely on the jurisdictional concerns surrounding advisory opinions. There was no discussion of whether the court might have discretion to decline jurisdiction over the Center's request for equitable relief *if* there were jurisdiction over the case. The district court concluded its analysis by reiterating that "[w]ithout jurisdiction the court cannot proceed at all in any case."

The district court's order dismissing this case was based squarely on its determination that the district lacked jurisdiction. It was not based on any exercise of discretion to decline jurisdiction.

**2.**

In any event, the district court could not properly have exercised discretion to decline jurisdiction over the case. Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). In outlining the rare exceptions to that principle, the Supreme Court has noted that "[t]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* at 813 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959)).

USFS insists, without support for its sweeping theory, that the general rule that a court should exercise the jurisdiction it is given does not apply when a party requests "equitable relief such as . . . an injunction." In support, USFS cites *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996).

*Quackenbush* stated generally, at the beginning of its analysis, that "a federal court has the authority to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a court of equity.'" *Id.* at 717 (quoting *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring)). But then, echoing *Colorado River*, *Quackenbush* reiterated that "federal courts have a strict duty to exercise the jurisdiction

that is conferred upon them by Congress," *id.* at 716, including jurisdiction to issue equitable relief. And, again like *Colorado River*, *Quackenbush* outlined specific "exceptional circumstances" in which "denying a federal forum would clearly serve an important countervailing interest," *id*.

> [F]ederal courts have the power to refrain from hearing cases that would interfere with a pending state criminal proceeding, or with certain types of state civil proceedings; cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law; cases raising issues "intimately involved with [the States'] sovereign prerogative," the proper adjudication of which might be impaired by unsettled questions of state law); cases whose resolution by a federal court might unnecessarily interfere with a state system for the collection of taxes; and cases which are duplicative of a pending state proceeding . . . .

*Id.* at 716–17 (second alteration in original) (citations omitted). USFS does not suggest that this case falls into any of these categories, in which the Supreme Court has recognized that "abstention is warranted," and the case does not.[2] *Id.* at 716.

---

[2] At oral argument, USFS's counsel said that the district court exercised "*Brillhart* abstention," an apparent reference to *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942). *Brillhart* is not

USFS also points the court to the Declaratory Judgment Act's permissive language, *see* 28 U.S.C. § 2201(a), to argue that the district court had discretion to decline jurisdiction. This suggestion rests on USFS's erroneous representation that the Center's "complaint identifies the Declaratory Judgment Act (and not RCRA) as the source of the district court's jurisdiction to grant declaratory and injunctive relief." The Center does cite the Declaratory Judgment Act in its Complaint. But the very first page of the Complaint states that "[t]his is a citizens' suit brought to enforce the Resource Conservation and Recovery Act (RCRA). It is authorized under Section 7002 of RCRA, 42 U.S.C. § 6972." And the Center's "Request for Relief" cites RCRA.

As we have explained, the RCRA private cause of action provision permits "any person" to "commence a civil action" alleging specified government actions, 42 U.S.C. § 6972(a), and authorizes judicial injunctive relief to curb such actions. Nothing in the private civil action provision confers judicial discretion to decline to entertain such a suit.

USFS also cites a series of cases addressing when a court has "discretion *to deny relief*." Whether a court may decline to issue an injunction after balancing the relevant harms is an entirely separate question from whether the court has jurisdiction over the merits, including the *request* for injunctive relief, in the first place.

---

cited in USFS's briefing and is not relevant here. *Brillhart* concerns the relevance to a federal case of concurrent state proceedings, *id*. at 494. There were no concurrent state proceedings here.

In sum, the district court did not purport to exercise discretion with regard to whether to hear this case, nor could it properly have done so.

## III.

Because the district court—improperly—determined that there was no jurisdiction over this case, it did not decide whether the operative Complaint states a claim under section 7002 and applicable pleading standards. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Here, the relevant considerations favor remanding for further proceedings so that the district court may in the first instance consider the merits of the potentially complex and unsettled issues presented by this case.

To state a claim under RCRA's citizen suit provision, a party must establish that the defendant "has *contributed* or . . . is *contributing* to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added).[3]        The

---

[3] We note that the present Complaint alleges only that USFS is liable for contributing to the "disposal" of lead ammunition, defined in the statute as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). It does not allege that USFS has contributed to the "storage" of those bullets. That term is defined in the statute with regard to

Complaint alleged USFS's "fail[ure] to take action to stop the disposal of lead in the form of spent ammunition on Forest Service land" as grounds for finding contributor liability. The Center in the district court argued that that USFS is a "contribut[or]" both because it possesses unused regulatory authority over the hunters and because Section 7003's liability standards are analogous to those imposed on private landowners at common law. The latter position analogizes USFS's "contribut[ion]" to a landowner's common law liability for nuisances caused by known abatable artificial conditions on her property. *See* Restatement (Second) of Torts § 839 (Am. Law Inst. 1979); Staff of H.R. Subcomm. on Oversight & Investigation, H.R. Comm. on Interstate & Foreign Commerce, 96th Cong., *Hazardous Waste Disposal* 31 (Comm. Print 1979) (Section 7003 "is essentially a codification of the common law public nuisance.").

USFS may be correct that the Center's first argument based on USFS's unexercised authority is foreclosed by *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846 (9th Cir. 2011). *Hinds* concerned whether a manufacturer of a product that generated hazardous wastes could be held liable as a "contributor" to the disposal of those wastes by a business using the product. 654 F.3d at 849. But, at the time of the disposal, the manufacturer had no ongoing connection to the product or to the place where it was used and disposed of. *See id*. And although *Hinds* placed great emphasis in determining contributor liability on whether the defendant's actions regarding the disposal were "active," *id.* at 850–52, it had no cause to consider the question presented here: whether owning or managing land on which disposal of solid

hazardous waste, but not with regard to solid waste, at issue here. *See id.* § 6903(33).

waste by third parties is ongoing, known, and unabated can be a sufficiently active role to permit contributor liability.

The parties dispute what the case law says about the potential for landowner abatement liability under the Center's second argument. There is some tension, or at least ambiguity, in suggestions from other circuits and from district courts as to whether ownership or management of property where disposal of solid waste is occurring and discarded wastes have accumulated is a sufficient basis for contributor liability. *See, e.g.*, *Cox v. City of Dallas*, 256 F.3d 281, 294–98 (5th Cir. 2001); *Conn. Coastal Fisherman's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1316 (2d Cir. 1993), *United States v. Waste Indus., Inc.*, 734 F.2d 159, 161 (4th Cir. 1984); *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1221 (D. Or. 2009).

The district court, in dismissing for lack of jurisdiction, never had the chance to consider these questions of first impression in the factual context presented by this case. Given these circumstances, we think it wise to permit further proceedings at the district court rather than reach the merits now, both so the parties can present the issues as they have evolved more fully and so the Center has the opportunity to seek to amend its Complaint so as to more fully spell out the bases for USFS's contributor liability, if it so chooses.

## IV.

For the foregoing reasons, the case is justiciable. We **REVERSE** the district court's dismissal and **REMAND** for further proceedings consistent with this opinion.